185 Cal.App.4th 194 (2010)
110 Cal. Rptr. 3d 222
THE PEOPLE, Plaintiff and Respondent,
v.
ROBERTO DUARTE, JR., Defendant and Appellant.
No. G041195.
Court of Appeals of California, Fourth District, Division Three.
June 2, 2010.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*196 Lynelle K. Hee, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Christine Levingston Bergman and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
O'LEARY, J.
Roberto Duarte, Jr., was convicted of discharging a firearm with gross negligence (count 1-Pen. Code, § 246.3, subd. (a)),[1] being a felon in possession of a firearm (count 2§ 12021, subd. (a)(1)), street terrorism (count 3-§ 186.22, subd. (a)), and misdemeanor brandishing a firearm (count 4-§ 417, subd. (a)(2)(A)). It was also found true he committed two of the felonies for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and he had previously suffered a strike and a serious felony prior (§§ 667, subds. (a), (d), (e)(1), 1170.12, subds. (b), (c)(1)). After the trial court denied Duarte's new trial motion, the court sentenced him to a total term of 15 years four months in state prison.
On appeal, Duarte argues the trial court erred in refusing to allow him to introduce evidence the gang expert who testified at trial had destroyed traffic tickets in order to prevent prosecution. He also claims the court erred by failing to stay the sentence on his street terrorism conviction (count 3), and the court should not have imposed punishment for the street terrorism conviction and enhancement. After oral argument, we requested the parties submit supplemental briefing on the effect of People v. Sanchez (2009) 179 Cal.App.4th 1297 [101 Cal.Rptr.3d 639] (Sanchez), on this case. Based on the well-reasoned opinion in Sanchez, we agree the court should have stayed sentencing on count 3 pursuant to section 654. His other claim has no merit, and we affirm the judgment as modified.

*197 FACTS
Brothers Victor Velasquez and Martin Velasquez[2] lived on Amberleaf Circle in Huntington Beach. Victor and Martin were both members of "Amberleaf" (AML) gang. The members of AML considered the group to be a gang, but law enforcement did not consider the group to be a criminal street gang because it did not meet the statutory definition. AML's rival was "South Side Huntington Beach" (SSHB), a criminal street gang.
One early afternoon, after Victor returned home from school, both brothers went to a park at the end of Amberleaf Circle. While at the park, the brothers observed a dark-colored car speed up the street and stop in front of the park. The driver got out of the car and someone yelled, "He's got a gun." The brothers ran and hid in some nearby bushes. From the bushes the brothers heard three gun shots and the shooter yell, "South Side" or "South Side Huntington Beach." The man drove away in the car.
Neither Victor nor Martin immediately reported the incident to the police. It was not until two weeks later, after being arrested for a probation violation, that Martin provided law enforcement with information regarding the shooting. Martin was unable to pick Duarte's picture from a photographic lineup. Victor also provided information regarding the incident at a later date when he got into some trouble with the police over graffiti.
Shortly after the incident, police officers responded to Amberleaf Circle to investigate the shooting. Officers were looking for a midnight blue four-door car with a license plate that partially read: "5DYZ[]18." Although witnesses were fearful and not initially forthcoming, some told officers "Big Time," later identified as Duarte's gang moniker, was on the street with a gun. A witness by the name of Angelita Ramirez declined to speak with officers at the scene, but she agreed to call Officer Juan Munoz later. Later that evening, Ramirez called and spoke with Munoz. Ramirez related she had seen her cousin, Mario Lemus, run in front of her apartment, and she walked out to see why he was running. As she walked out she saw a person whom she recognized as "Roberto" pointing a black-colored handgun in her direction. During a later interview, Ramirez was able to identify the gun as a revolver handgun. Ramirez said that when she realized "Roberto" was pointing the gun at her, she walked back into the house and locked the door. "Roberto" was further identified with the last name Duarte, and a physical description. Ramirez indicated Duarte was a male Hispanic, five feet eight to five feet 11 inches tall, about 23 years of age with a shaved head and a tattoo of writing on his neck. Ramirez stated she had known Duarte for approximately five to *198 seven years and had last seen him about a year or a year and a half ago. She would see him often when he came to her apartment complex to visit someone in an upstairs apartment. When Munoz showed Ramirez a photographic lineup including Duarte's picture, she was unable to identify anyone.
Two days after the shooting, Munoz observed Duarte seated in a vehicle that was parked next to a midnight blue four-door car with a license plate of "5DYZ718." Duarte's head was shaved, and he had "S.S.H.B." tattooed on the side of his head. When Munoz contacted Duarte, Munoz asked him if he had been at the Amberleaf location at the time of the shooting, and if the midnight blue car belonged to him. Initially, Duarte denied being present at the Amberleaf location on the day of the shooting, but admitted the car belonged to him. Later, Duarte disclosed he had been there looking for a group of AML members who had been bothering his younger brother. Duarte explained he had driven the midnight blue four-door Impala to Amberleaf but denied being involved in the shooting. Duarte advised Munoz that at the time the shooting took place he was filling out some job applications.
Ramirez testified at trial but said the only reason she was testifying was because she had been subpoenaed. She recounted that she and others in the neighborhood would not speak with Munoz because people in her neighborhood do not like to talk to police. She testified she was afraid to talk to Munoz and take his business card. Ramirez testified she had seen a bald man in a white T-shirt with writing on his neck holding a black object in his hand. She claimed she could not tell what the black object was, and denied telling Munoz it was a gun. As to the specifics of the description she gave Munoz, Ramirez at times claimed to not remember. Alternatively, she altered the description she provided Munoz rendering it less detailed. Ramirez said she did not recall if she had told Munoz the man she had seen was Duarte, whom she had known for six or seven years. Contrary to what she told Munoz about seeing Duarte on numerous occasions prior to the incident, Ramirez claimed to have only seen Duarte one time. Ramirez also claimed to recall identifying someone in the lineup, who was not Duarte, as looking familiar to her.
Munoz testified he knew Duarte from previous contacts but had never arrested him. He described Duarte as having been heavier in the past but that the shaved head and tattoo on the side of his head were consistent with Munoz's past observations of Duarte. Munoz was aware of only two other SSHB members with similar tattoos and both were in custody at the time of the incident. Munoz also testified as to statements Ramirez made to him the night of the incident that were inconsistent with her testimony at trial.
Huntington Beach Detective Arthur Preece testified as a gang expert. He testified that gang tattoos demonstrate a member's pride in the gang and a *199 member's permanent allegiance to the gang. He opined committing crimes, especially with a gun, garners respect for the offender or his gang and serves to intimidate potential witnesses from cooperating with law enforcement. Throughout his 22-year career with the Huntington Beach Police Department, Preece had interacted with members of the SSHB gang. He testified the gang had been in existence for more than 30 years and was an ongoing organization with about 70 members. He described SSHB's primary activities, pattern of criminal activity, and common names and symbols. He further testified as to the commission of two predicate crimes by the gang to establish SSHB was a criminal street gang as defined in section 186.22, subdivision (f).
With respect to Duarte's involvement in the gang, Preece described Duarte's continued association with known SSHB members dating back to 2001, and opined Duarte was an active member of SSHB on the date of the incident. Preece testified Duarte's moniker was "Big Time," and he had a number of SSHB gang-related tattoos, including "S.S.H.B." on the side of his head. Based on a hypothetical mirroring of the facts of the incident, Preece opined the crime was committed for the benefit of SSHB.
Prior to Preece testifying, Duarte sought permission to impeach Preece with information he had destroyed traffic tickets to prevent prosecution. Duarte's defense counsel advised the court he had received information from the prosecutor in an unrelated case that on approximately four or five occasions over a seven-to-eight-year period, Preece kept routine traffic tickets from being put into the system. Counsel cited an affidavit Preece had prepared for an unrelated case. In it, Preece declared there were no copies of the tickets he had destroyed, or any reports relating to the destruction of the tickets. Preece also stated he had no recollection of conversations with other officers regarding his actions with regard to the tickets. Duarte asserted he did not know exactly what keeping routine traffic tickets from being put into the system entailed. He questioned whether this meant Preece directed another officer to pull a ticket before it was filed. Or did Preece go to the file room, or wherever citations are filed at Huntington Beach Police Department, and pull the citation himself? He then hypothesized as to what Preece may have informed other Huntington Beach police officers. He stated this information "opens a Pandora plethora of questions."
Duarte's defense counsel argued preventing the citations from getting into the system was a "criminal violation." He advised the court he intended to "take this information . . . to the United States Attorney's Office, at a minimum[, and] refer it to the Huntington Beach Internal Affairs Department[,] [b]ecause[] there [were] questions . . . of concealment of evidence, destruction of evidence, conspiracy, obstruction of justice, and probably . . . a number of other federal statutes [the conduct] could *200 potentially . . . implicate." Duarte's counsel then advised the court it was "incumbent that the court should appoint counsel and have [Preece] properly advised."
The prosecutor did not dispute Preece had destroyed tickets. But the prosecutor explained members of a family in a neighborhood where Preece worked were witnesses to a gang-related crime. The father in that family had received citations for driving on a suspended license while driving his disabled daughter to the doctor. Preece told her he destroyed the tickets to help a family involved in the unrelated case. The prosecutor insisted Preece did not lie at any time about what he had done when asked about the tickets. If anything, the detective may have failed to follow the procedures set out by his department for how to handle this type of situation. The prosecutor argued if evidence regarding a possible violation of a department policy or procedure were admitted, it would consume a huge amount of time.
Duarte's counsel insisted this information was proper impeachment because the conduct was relevant on issues of character and honesty. The prosecutor indicated that although counsel repeatedly asserted Preece's conduct amounted to a violation of law, she was unclear on what law it was that Preece allegedly violated. The prosecutor again argued this conduct amounted to a failure to follow department procedure and was not relevant to prove a witness's character for truthfulness. There was no evidence Preece ever lied about what he had done in connection with the tickets, in fact he was quite candid in his statements. The prosecutor objected to evidence regarding the tickets being admitted for the purpose of impeachment.
The trial court found Duarte's offer of proof vague and based, in significant part, on speculation. The court stated the information appeared to be irrelevant, and to the extent it might be relevant, it found the evidence to be remote and minimal at best. There was a danger the evidence would confuse and mislead the jury. Admission of the evidence would constitute an undue consumption of time on a collateral issue. The court noted the evidence was based on some sort of misconduct and not a conviction. Lastly, the court found the probative value of the evidence was outweighed by its prejudicial value. After making these findings, the court excluded the evidence under Evidence Code section 352.
Duarte called two alibi witnesses, Tiffany Pinero and Barbara Koch. Pinero, Duarte's girlfriend, was working at Quality Drug Long Term Care in Newport Beach on March 2, 2007, the day of the incident. Pinero recalled having lunch with Duarte at her workplace on March 2 and Duarte leaving her workplace at approximately 1:45 p.m. to go to a job interview. Koch, the owner of A-Ok Rentals, confirmed she interviewed Duarte for a job on March *201 2. Although she could not recall the exact time of the interview, she believed it took place sometime between 12:00 p.m. and 4:00 p.m.
Duarte also called an investigator with the Orange County Alternate Public Defender's Office, Rolando Chavez, regarding an interview he had with Ernest Williams, Duarte's parole agent. Williams told Chavez that he had spoken with Munoz the afternoon of the incident and Munoz told him that Duarte had been seen with a gun at a gang member's funeral, but the Amberleaf incident was not discussed.
The prosecutor called Munoz to rebut issues raised by the defense evidence. Munoz testified he had given information to Williams about the gang member's funeral, but it was a separate incident not related to the Amberleaf incident. He believed Williams had confused the two incidents. Munoz testified when he arrested Duarte, Duarte never said he was with Pinero on March 2. Munoz also testified when he asked Duarte if he went anyplace other than A-Ok Rentals the afternoon of March 2, Duarte said he had but would not disclose where he had gone. The prosecutor also called a police officer witness who testified as to the driving times and distances. The officer calculated the driving time and distance between Pinero's workplace and Amberleaf to be about 11 to 12 minutes and about eight miles. The officer calculated the driving time between A-Ok Rentals and Amberleaf at 3:45 p.m. to be about five minutes but believed traffic was usually heavier at 3:45 p.m. than it would be at 1:45 p.m.
Prior to trial, the trial court granted Duarte's motion to bifurcate the trial on the strike and serious felony prior allegations. The jury convicted Duarte on all counts and found all allegations to be true. Duarte waived his right to jury trial on the strike and serious felony prior allegations. The court found both the strike and the prior allegations to be true.
The trial court sentenced Duarte to four years on the discharging a firearm with gross negligence count (count 1), a five-year consecutive term on the accompanying street terrorism enhancement, four years on the felon in possession of a firearm count, (count 2), 16 months, consecutive, on the participation in a criminal street gang count (count 3), and 365 days on the misdemeanor brandishing a firearm count (count 4). Pursuant to section 654, the court stayed the sentences on count 2 and the gang allegation on this count, and stayed the sentence on count 4. The court imposed an additional five years for the serious felony prior allegation. Duarte filed a timely notice of appeal.

*202 DISCUSSION

I. Prejudicial Exclusion of Evidence[*]

II. Penal Code Section 654

Duarte contends the trial court erred by failing to stay the sentence on count 3, street terrorism, pursuant to section 654 because he had the same intent and objective in count 1, discharging a firearm with gross negligence. He also argues section 654 bars punishment for both the substantive street terrorism offense and the street terrorism enhancement. He asserts that where two criminal acts are committed for the benefit of a criminal street gang (the enhancement) and the same acts are committed to further, promote, or assist the same criminal street gang (the substantive offense), the punishment for street terrorism must be stayed pursuant to section 654.[4] We will address his contentions below.
In pertinent part section 654 provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)
(1) Section 654's purpose is to "to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offensethe one carrying the highest punishment." (People v. Liu (1996) 46 Cal.App.4th 1119, 1135 [54 Cal.Rptr.2d 578].) Multiple punishment for more than one offense arising from the same act or from a series of acts constituting an indivisible course of conduct is prohibited. (People v. Lewis (2008) 43 Cal.4th 415, 519 [75 Cal.Rptr.3d 588, 181 P.3d 947].) If all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, the defendant may be found to have harbored a single intent and therefore may *203 be punished only once. (People v. Palmore (2000) 79 Cal.App.4th 1290, 1297 [94 Cal.Rptr.2d 784].) But section 654 does not preclude multiple punishment if the defendant entertained multiple criminal objectives that were independent of and not merely incidental to each other. (People v. Braz (1997) 57 Cal.App.4th 1, 10 [66 Cal.Rptr.2d 553].)
Here, the trial court imposed a four-year term on the discharging a firearm with gross negligence count (count 1), and imposed but stayed pursuant to section 654 the sentence on the felon in possession of a firearm count (count 2). The court imposed a separate consecutive term of 16 months on the street terrorism count (count 3). In so doing, the court found Duarte harbored a separate intent and objective on the street terrorism count. "`A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence.' [Citation.]" (People v. Racy (2007) 148 Cal.App.4th 1327, 1336-1337 [56 Cal.Rptr.3d 455].)
Before addressing the facts before us, we begin with a review of the development of the relevant case law. A little over 10 years ago a different panel of this court first addressed application of section 654 in the context of a gang participation charge in People v. Herrera (1999) 70 Cal.App.4th 1456 [83 Cal.Rptr.2d 307] (Herrera). In Herrera, the defendant, a gang member, fired three shots at a rival gang member's house from the front passenger seat of a vehicle. One bullet struck an 11-year-old boy, and another bullet struck a man in the left shoulder, breaking a bone. The vehicle then made a U-turn and returned for a second pass, and approximately 10 additional shots were fired, but no further injuries were inflicted. A jury convicted the defendant of a variety of offenses including one count of street terrorism and two counts of attempted murder. (Id. at p. 1462.) The court reasoned, "The characteristics of attempted murder and street terrorism are distinguishable, even though aspects of one may be similar to those of the other." (Id. at p. 1466.) In concluding section 654 did not apply, the court relied on the distinctions between the requisite intents for the two crimes. The court said the crime of attempted murder required the defendant to have the specific intent to kill, whereas the crime of street terrorism required the defendant to have the intent and objective to actively participate in a criminal street gang. The court noted, to be guilty of street terrorism, the defendant need not have the intent to personally commit the particular felony. (70 Cal.App.4th at p. 1467.)
In In re Jose P. (2003) 106 Cal.App.4th 458 [130 Cal.Rptr.2d 810] (Jose P.), the juvenile court found minor had committed home invasion robbery, false imprisonment, first degree burglary, and street terrorism. The court found true the allegation he had committed these crimes, with the exception of street terrorism, for the benefit of, at the direction of, or in *204 association with a criminal street gang. (§ 186.22, subd. (b)(1).) The court committed the minor to the California Youth Authority. The court calculated the maximum period of confinement as nine years for the robbery increased by 10 years for the gang enhancement and an additional eight months for the street terrorism offense. (Jose P., supra, 106 Cal.App.4th at p. 458.) On appeal minor argued section 654 prohibited the imposition of a separate term of confinement on the street terrorism offense. The court noted the instant robbery was not the only felonious act upon which the court could have based its finding minor had committed street terrorism because minor had also been found guilty of attempted robbery in a prior proceeding. (Jose P., supra, 106 Cal.App.4th at p. 470.) Relying on Herrera, the court indicated that even if minor's criminal liability for the street terrorism offense depended upon his participation in the robbery, the record supports a finding he harbored the separate intent and objective to participate in the gang. Accordingly, section 654 did not preclude separate punishment. (106 Cal.App.4th at p. 470.)
The holding in Herrera was followed by this court in People v. Ferraez (2003) 112 Cal.App.4th 925 [5 Cal.Rptr.3d 640] (Ferraez). In Ferraez, the appellant was convicted of possessing for sale cocaine base (Health & Saf. Code, § 11351.5), and street terrorism (Pen. Code, § 186.22, subd. (a)). The jury also found true the allegation the first offense was committed to benefit or assist a criminal street gang (§ 186.22, subd. (b)(1)). The trial court sentenced the defendant to four years for the drug offense and a concurrent term of two years for street terrorism, and stayed the sentence on the gang enhancement. (Ferraez, supra, 112 Cal.App.4th 925, 928.) On appeal the defendant asserted the trial court erred by failing to stay his sentence on the street terrorism conviction pursuant to section 654. He argued that although he committed two offenses, he only possessed one intent and objective when he did so. In rejecting the defendant's argument, the court found the defendant possessed the drugs with the intent to sell, and committed the drug offense with the intent to promote or assist the gang. The court reasoned, "While he may have pursued both objectives simultaneously, they were nonetheless independent of each other." (Ferraez, supra, 112 Cal.App.4th at p. 935.) Jose P., supra, 106 Cal.App.4th 458, and Ferraez, supra, 112 Cal.App.4th 925, followed Herrera, supra, 70 Cal.App.4th 1456, in rejecting application of section 654.
(2) In Sanchez, supra, 179 Cal.App.4th 1297, our colleagues in Division Two of the Fourth District disagreed with the Herrera court's reasoning. After a thorough and discerning review of Herrera and its application in subsequent cases, the Sanchez court rejected the reasoning and holding in Herrera and held that where a defendant is convicted of both (1) a crime that *205 requires as one of its elements the intentional commission of an underlying offense and (2) the underlying offense itself, section 654 bars multiple punishment. By way of analogy, the Sanchez court noted the prohibition against separate punishment for both felony murder and the underlying felony. (Sanchez, supra, 179 Cal.App.4th at p. 1315.)
The Sanchez court criticized the Herrera court's limited focus on the defendant's culpability, which prevented it from considering other valid factors. While culpability was a valid consideration, the Sanchez court noted it was not determinative, and it disputed the Herrera court's holding that every time a defendant was convicted of two crimes carrying different specific intents, section 654 was inapplicable. (Sanchez, supra, 179 Cal.App.4th at p. 1313.) Relying on People v. Harrison (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078], the Sanchez court also disputed the Herrera court's conclusion section 654 is inapplicable to a defendant who entertains multiple objectives. Rather the Sanchez court opined multiple criminal objectives alone are not a bar to the application of section 654, explaining that it is only multiple independent objectives that bar application of section 654. (Sanchez, supra, 179 Cal.App.4th at p. 1314.)
The Sanchez court also questioned the Herrera court's statement a defendant convicted of street terrorism "`does not need to have the intent to personally commit the particular felony (e.g., murder, robbery or assault) ....'" (Sanchez, supra, 179 Cal.App.4th at p. 1314; see Herrera, supra, 70 Cal.App.4th at p. 1467.) The Sanchez court reasoned that the underlying crime "[was] the act that transformed mere gang membershipwhich, by itself, is not a crimeinto the crime of gang participation. Accordingly, it makes no sense to say that defendant had a different intent and objective in committing the crime of gang participation than he did in committing the robberies." (Sanchez, supra, 179 Cal.App.4th at p. 1315.) Thus, the court observed, "[I]f the defendant is also found guilty of the underlying offense, the defendant's intent and objective in committing both offenses must be the same." (Id. at p. 1314.)
The Sanchez court then focused on an example used in Herrera. The Herrera court used the example of a murder committed by other gang members where the defendant was not liable for the murder as either a perpetrator or an aider and abettor, but was merely guilty of being an accessory after the fact. (Herrera, supra, 70 Cal.App.4th at pp. 1467-1468.) The Sanchez court found this example inapt because the defendant could only be convicted of accessory after the fact and, therefore, section 654 would not be implicated. (Sanchez, supra, 179 Cal.App.4th at p. 1314.)
*206 Relying on the example in Herrera, the Sanchez court held in applying section 654, the dispositive question is not whether the defendant's intent and objective in committing street terrorism was the same as the intent and objective of the gang in committing the murder, but whether it was the same as the defendant's intent and objective in committing the crime of being an accessory. (Sanchez, supra, 179 Cal.App.4th at p. 1314.)
(3) We find the reasoning in Sanchez persuasive, and agree that where the underlying felony is a necessary element of the street terrorism charge, section 654 bars separate punishment. (4) Here, the evidence demonstrated Duarte fired a weapon on one occasion. The prosecutor charged Duarte with three felony offenses arising out of the one shooting. The Attorney General accurately notes the jury was instructed it could not convict Duarte of street terrorism unless the prosecution proved he engaged in felonious conduct. The trial court instructed the jury felonious conduct meant committing or attempting to commit either the crime of discharging a firearm with gross negligence (count 1) or possession of a firearm by a felon (count 2). Accordingly, the commission of either offense constituted a necessary element of the crime of street terrorism, and therefore, Duarte could not be punished for both counts 3 and counts 1 or 2.
The Attorney General asserts Sanchez was wrongly decided. The Attorney General argues the Sanchez court's interpretation of section 654 would render the street terrorism statute a nullity. We disagree. As the Jose P. court noted, the prosecution has the option of relying on a felony not charged in the instant case to satisfy the felonious conduct element of the street terrorism offense. (Jose P., supra, 106 Cal.App.4th at p. 470.)
Alternatively, the Attorney General notes the trial court stayed the punishment on count 2, possession of a firearm by a felon. Relying on this fact, the Attorney General argues count 2 could be relied upon to satisfy the requisite felonious conduct element of street terrorism. Not so. The trial court appropriately stayed punishment on count 2 pursuant to section 654 because it imposed punishment on count 1. Under the same reasoning, count 2 could not be used to support separate punishment on count 3. We agree with Duarte's contention section 654 bars punishment for the firearm offense and a separate punishment for the street terrorism substantive offense for the same conduct.
Duarte also suggests section 654 precludes separate punishment for the substantive street terrorism offense and the street terrorism enhancement. Our finding that section 654 prohibits separate punishment on the street terrorism offense renders this argument moot.

*207 DISPOSITION
We affirm the convictions but modify the judgment as follows: The 16-month term imposed on count 3, street terrorism, is ordered stayed pursuant to section 654. The trial court is directed to prepare an amended abstract of judgment consistent with this opinion and forward it to the Department of Corrections and Rehabilitation, Division of Adult Operations.
Rylaarsdam, Acting P. J., and Aronson, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.
[1] All further statutory references are to the Penal Code, unless otherwise indicated.
[2] For purposes of clarity, we refer to the brothers by their first names.
[*] See footnote, ante, page 194.
[4] The California Supreme Court has not decided whether section 654 applies to sentence enhancements. (People v. Palacios (2007) 41 Cal.4th 720, 728 [62 Cal.Rptr.3d 145, 161 P.3d 519] ["[W]e need not address the People's argument that section 654 generally does not apply to enhancements. We leave that question for another day."].) The Courts of Appeal are split on the issue. (People v. Arndt (1999) 76 Cal.App.4th 387, 394-395 [90 Cal.Rptr.2d 415], and cases cited therein.) We will decide the issue.