Filed 7/17/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRITTANY KIM DOWDELL et al.,<br><br>    Defendants and Appellants. | H037404<br>(Santa Clara County<br> Super. Ct. Nos. EE907147,<br> CC501296, and CC754220) |

Defendants Terrance Ray Lincoln and Brittany Kim Dowdell were tried before dual juries for offenses arising out of a robbery/carjacking/kidnapping incident in Sunnyvale. The jury trying Lincoln (the Lincoln jury) found him guilty on five counts as charged: Count One—kidnapping for ransom or extortion; Count Two—kidnapping during a carjacking; Count Three—carjacking; Count Four—kidnapping for robbery; and Count Five—criminal threats. (Pen. Code, §§ 209, subd. (a), 209.5, 215, 209, subd. (b)(1), 422.) The trial court found two prior prison term allegations true and sentenced Lincoln to two concurrent terms of life with the possibility of parole, consecutive to four years.[1]

Dowdell was charged with the same counts as Lincoln, except she was not charged with Count Five—criminal threats. The jury trying Dowdell (the Dowdell jury) found her guilty on two counts: Count One—kidnapping for ransom or extortion; and Count

---

[1] The court also sentenced Lincoln on two unrelated felonies not at issue in this appeal.

Four—kidnapping for robbery.  The jury hung on Counts Two and Three.  The trial court sentenced Dowdell to life in prison with the possibility of parole.

On appeal, Lincoln claims: (1) the trial court should have excluded his allegedly coerced confession; (2) the prosecutor committed misconduct by stating that "The presumption of innocence is over" in closing argument; (3) the trial court erred in denying his midtrial motion to relieve his retained trial counsel; (4) his sentence on either Count One or Count Two should have been stayed under Penal Code section 654 (section 654); and (5) his conviction on Count Three for carjacking must be reversed because it is a lesser included offense of kidnapping during a carjacking.  As to the fourth claim, we conclude that section 654 requires the sentence to be stayed on either Count One or Count Two.  And the Attorney General concedes the fifth claim relating to Count Three; we accept her concession.  Accordingly, we will stay the sentence on Count Two and strike the conviction on Count Three (carjacking).  We find all other claims without merit, and we will affirm the judgment as modified.[2]

Dowdell claims: (1) the trial court's jury instructions erroneously limited the jury's ability to consider evidence of intimate partner battering in determining whether she formed the specific intent necessary to commit the charged offenses; (2) the prosecution committed misconduct by referring to the possibility of probation during closing argument; and (3) her sentence on Count Four should have been stayed under section 654.  As to Dowdell's first claim, we agree that the court erroneously instructed the jury on intimate partner battering, but we find the error harmless.  And we find Dowdell's second claim of prosecutorial misconduct to be without merit.  As to her third claim, the trial court's oral pronouncement stayed the sentence on Count Four, but the

---

[2] In a separate petition for writ of habeas corpus (*In re Lincoln*, H039399), Lincoln raises an additional claim of ineffective assistance of counsel.  By separate order of this date, we deny Lincoln's petition for habeas corpus.

2

abstract fails to reflect the court's pronouncement. We will therefore order the abstract corrected to stay the sentence on Count Four and we will otherwise affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the time of the offenses, Lincoln was a 36-year-old, self-employed musical entertainer. Dowdell, his girlfriend of six months, was 20 years old and unemployed. She was pregnant with Lincoln's child at the time of arrest. Dowdell's childhood friend, Derric Shavens, also participated in the robbery/carjacking/kidnapping incident. Shavens testified for the prosecution under a grant of immunity.

### A. *Facts of the Offenses*

On the evening of April 13, 2009, Shavens, under Lincoln's direction, picked up both defendants in his car and drove them to Sunnyvale. Shavens saw a gun tucked into Lincoln's waistband under his shirt. Dowdell later testified—and Lincoln told police— that the gun was a plastic, toy gun that Lincoln had colored black with a Sharpie pen.

Lincoln said he needed money, and he told Dowdell and Shavens that he planned to rob someone. At around 10:00 p.m., they approached a car wash in Sunnyvale. Lincoln told Shavens to pull over, whereupon Shavens parked his car on the street just beyond the car wash. Lincoln got out of the car and walked toward the car wash while Dowdell and Shavens stayed in the car.

Benjamin Toma, the victim, was washing his Chevrolet Avalanche truck at the car wash. While Toma was replacing the floor mats in his truck, Lincoln approached him from behind, put his hand on Toma's neck, and held the gun to Toma's head. Toma resisted and swung his fist backward, knocking the gun out of Lincoln's hand. Toma grabbed the gun, but Lincoln punched him four times in the side of the head, causing Toma to lose consciousness. When Toma regained consciousness, Lincoln had regained control of the gun. Lincoln shoved Toma back into his truck and pushed him onto the floor of the rear seating area. Lincoln said "Don't move until I call my partners," and demanded that Toma give him $300.

3

Lincoln then waved and whistled at Dowdell and Shavens.  Shavens pulled his car into the car wash, and Dowdell got out of the car to walk to Toma's truck.  Lincoln got into the front of the truck and told Dowdell to get into the back of the truck with Toma.  Lincoln gave the gun to Dowdell and told her to hold it on Toma.  Dowdell put her feet on top of Toma and held the gun against his back.  Lincoln told Toma not to move and instructed Dowdell to shoot Toma in the back to paralyze him if he disobeyed.  Lincoln also threatened to shoot Toma if Lincoln did not get more money.  At some point during this time, Lincoln took Toma's phone, keys, and wallet, including $50 in cash and his Automated Teller Machine (ATM) card.

Lincoln drove Toma's truck out of the car wash while Dowdell kept Toma in the back of the truck at gunpoint.  Shavens followed them in his car.  After driving for about five minutes, Lincoln stopped the truck at a Wells Fargo bank with an ATM.  Lincoln demanded the Personal Identification Number (PIN) for Toma's ATM card and threatened to kill him if he supplied the wrong number.  Toma revealed the PIN.  Lincoln then told Dowdell to take the card to the ATM while he stayed in the truck with the gun to guard Toma.  Dowdell did as she was told, but she was unable to extract any cash from the machine.  Lincoln cursed angrily at Toma, and Toma believed he was about to be killed.  Toma begged them to go to a Bank of America, where Toma kept his bank account.

Lincoln then drove the truck to an ATM at a Bank of America while Dowdell again used the gun to keep Toma in the back of the truck.  Shavens continued to follow them in his car.  Lincoln again threatened to kill Toma if the PIN did not work.  At the Bank of America, Dowdell went to the ATM while Lincoln kept Toma in the truck.  Dowdell once again failed to extract money from the ATM.  Lincoln also attempted to extract money from the Bank of America ATM, but he too failed.

Surveillance video from a camera at the ATM showed Dowdell using the machine shortly after 11:30 p.m., and bank records showed several attempts to extract cash from

4

the ATM around the same time. Surveillance video from a camera in the bank parking lot showed Shavens' car and Toma's truck parked in the lot. At trial, Shavens identified Lincoln in the video footage, but he also testified that he did not know whether Lincoln had gotten out of the truck at that bank.

Before leaving Toma, Lincoln threatened to send "bad cops" to visit Toma and his family if Toma tried to contact the police. Lincoln removed Toma's pants and shoes, pushed him inside the truck, and told him not to move. Shavens saw Lincoln throw the shoes and pants across the parking lot.

Dowdell left the truck and got into Shavens' car. Dowdell told Shavens that Lincoln had just robbed somebody and left him in the back of the truck. She said Lincoln had instructed her to hold Toma in the back of the truck with the gun while Lincoln drove to the ATM locations.

Lincoln then joined Dowdell in Shavens' car and told Shavens to drive away, leaving Toma in the bank parking lot. They stopped at another ATM, and they stopped at a gas station, where Lincoln used Toma's card to buy gasoline for Shavens' car.

After Toma heard Shavens' car drive away, Toma walked to a nearby Denny's restaurant to get help. When police arrived, they observed swelling, abrasions, and broken skin on Toma's head. They found Toma's truck in the Bank of America parking lot, where it appeared to have been ransacked.

The next day, April 14, 2009, Lincoln called Toma on his home telephone. Dowdell saw Lincoln make the call. Toma recognized the voice as that of his attacker.[3] Lincoln asked for Toma, but Toma claimed he was someone else and that Toma was in the hospital. Lincoln called Toma again on April 22, 2009, and threatened to send a "bad cop from Oakland" to visit Toma if he went to the police. Lincoln also said he had Toma's driver's license, which Lincoln had taken during the robbery.

---

[3] At trial, Toma testified that his home phone number was stored in his cell phone, which Lincoln had stolen during the robbery.

Police traced both phone calls to a cell phone registered to Devante Ray, the name of Lincoln's son. The cell phone was also registered with a birth date of August 17, 1972, which is Lincoln's date of birth. Phone records showed the cell phone had made frequent calls to a phone number belonging to Dowdell. The cell phone had also been used to make a call shortly after midnight on the night of the robbery. The call went through a cell tower near a Bank of America where one of the fraudulent transactions had been attempted. Police later recovered the phone from Lincoln's person, and he admitted the phone was his.

B. *Lincoln's Statement and Testimony*

After police took Lincoln into custody, he waived his *Miranda* rights and police interrogated him at length. An audio recording of the interrogation was played for the Lincoln jury, but not the Dowdell jury. In the statement, Lincoln admitted his involvement in the crime. He stated that the initial plan was to steal a purse or wallet, not to kidnap the victim. He admitted that he and Dowdell took Toma's truck while Shavens followed them to two different banks, but he repeatedly claimed that the gun was merely a toy. [4] He denied making any phone calls to Toma after the robbery.

Lincoln testified at trial before both juries. He denied any involvement in the robbery and claimed he was elsewhere at the time. He testified at length, in narrative fashion,[5] about his relationship with Dowdell. Lincoln and Dowdell were romantically involved at the time of the crime, although Lincoln remained married to another woman. He claimed he first learned of Dowdell's involvement in the crime when he saw a photograph of her on a website called "Fugitive Watch" that had published details of the crime to the public. He testified that Dowdell was involved with another man at the time of the robbery, and that she was pregnant. Lincoln claimed that Dowdell did not know whether Lincoln or the other man had impregnated her.

---

[4] The jury found all gun enhancements not true.

[5] Lincoln gave most of his testimony without questions from his attorney.

In his testimony, Lincoln admitted that he had given a statement to police confessing to his involvement in the robbery. But he also testified that his prior statement was not true, and that he had given a false confession to the police "to deflect as much information as I possibly could away from [Dowdell]" in an attempt to lessen her liability. Lincoln claimed he had loaned his cell phone to Dowdell and Shavens after learning of the robbery. On cross-examination, he also claimed that he had also loaned his phone to Dowdell on the night of the robbery. Lincoln admitted having prior convictions and he admitted he had been required to register as a sex offender.

C. *Dowdell's Defense and Evidence of Intimate Partner Battering*

Dowdell also gave a statement to police admitting her involvement in the crime. An audio recording of her statement was played for the Dowdell jury, but not the Lincoln jury.[6] She told police that Lincoln instructed her to remain silent throughout the offense so as not to reveal to Toma that she was female.

At trial, Dowdell testified that when she first met Lincoln in November 2008, she was unemployed and her self-esteem was low. As the relationship progressed, Lincoln became more possessive and controlling. Lincoln would call her 15 or 20 times a day, and he insisted she be alone when they talked on the phone. He was "authoritative," or "strong and stern" with his voice and she reacted "kind of like a dog with his tail between his legs." He once told her to stand in a corner after an argument. She testified that "he was in charge. What he said goes." Lincoln wanted to control every aspect of Dowdell's life, telling her how to dress and how to wear her hair. He pressed her to surrender her will to him. She wrote a letter in response stating, "I surrender and give all of myself to you, do whatever you ask, when you ask without question or hesitation." He once convinced her to prostitute herself. She did not want to prostitute herself, but she was

---

[6] Dowdell testified before the Dowdell jury, but not the Lincoln jury.

7

afraid he would leave her if she refused. On another occasion, while they were having sex, Lincoln struck her hard and hurt her, causing her to cry.

Dowdell testified in detail to the facts of her involvement in the crime. She testified that she did not intend to rob, kidnap, or carjack Toma. She claimed she was merely obeying Lincoln's instructions. She further testified that she did not know, prior to the offense, that Lincoln intended to kidnap anyone or carjack a vehicle, and she did not know Lincoln intended to drive the truck away when she first got into the back of the truck with Toma. She admitted that she had the chance to withdraw from the crime and retreat to Shavens' car, but she testified that she was afraid Lincoln might hurt her if she did not follow his instructions. She admitted that she had remained silent throughout the offense, but she denied that Lincoln had instructed her to do so.

Shavens testified to the Dowdell jury (but not to the Lincoln jury) that he was fearful of Lincoln because of past threats Lincoln had made. Lincoln once threatened to harm Dowdell's stepsister, and Lincoln said he knew people who could bring harm to other people. Shavens also testified that Dowdell became less fun and outgoing after she met Lincoln, and that she abandoned her family after meeting him.

Dowdell's mother and stepsister both testified in Dowdell's defense. Dowdell's mother testified that Lincoln took advantage of Dowdell, and that he manipulated and controlled her. Dowdell's mother also testified that Lincoln once called their house and said "he knew people in Oakland that would come and kill all of us." Dowdell told her mother that Lincoln's threat was serious.

Dowdell's stepsister testified that Lincoln would call Dowdell 15 to 25 times a day, and that Dowdell would do anything Lincoln told her to do. Dowdell's stepsister also testified that she once found fraudulent checks in Dowdell's purse. After telling Dowdell's mother about the checks, Lincoln left the stepsister a voicemail telling her, "You fucked up, kiss your baby goodbye."

8

Lincoln's wife testified that after she discovered Dowdell was dating Lincoln, she sent an email to Dowdell stating, "I'm writing because I thought, here we go again. [Lincoln] has found some young woman to use and destroy."

Family therapist Linda Skerbic testified in Dowdell's defense as an expert on intimate partner battering syndrome, historically called "battered woman syndrome." Skerbic set forth four factors that establish the syndrome, and she described the effect of the syndrome on a woman. First, a woman accepts responsibility for the problems in the relationship and she accepts responsibility for fixing them. Second, she takes on the fault for any problems. Third, she has a fear of harm to herself or family members. Fourth, she develops a mental mindset wherein she feels the abuser is all wise and omnipresent and that she cannot escape from his constant involvement or control. Intimate partner battering syndrome does not have to involve physical abuse; it can involve mental and emotional abuse based on the abuser's tone of voice or intimidating physical presence. Over time, the battered partner learns helplessness, stops thinking for herself, and gives control of her life to the abuser. She can be easily intimidated and becomes overly trusting, allowing herself to be manipulated by the abuser even to the point of becoming "robotic," such that she acts on command.

Mary Ann Yaeil Kim, a licensed clinical psychologist, testified for the defense as an expert in psychological testing and assessment. She performed a diagnostic study of Dowdell and evaluated her for about six or seven hours. She diagnosed Dowdell with post-traumatic stress syndrome and concluded that she has aspects of a dependent personality disorder. This meant that Dowdell was "fearful for her well-being" and "spent a lot of time in [. . .] dissociative episodes," making her unable to make clear choices. She further described Dowdell as "extremely immature and naïve" and "extremely conflict avoidant," with a "low interpersonal I.Q." As a result of her background, Dowdell was "very vulnerable to the direction of others" and "extremely compliant" with any person in a position of authority.

9

D. *Procedural Background*

On February 25, 2010, the prosecution charged both Lincoln and Dowdell by information with: Count One—kidnapping for ransom or extortion (Pen. Code, § 209, subd. (a)); Count Two—kidnapping during a carjacking (Pen. Code, § 209.5); Count Three—carjacking (Pen. Code, § 215); and Count Four—kidnapping for robbery (Pen. Code, § 209, subd. (b)(1)). The information charged Lincoln only with Count Five— criminal threats. (Pen. Code, § 422). The information further alleged that both defendants personally used a handgun in the commission of Counts One through Four. (Pen. Code, § 12022.53, subd. (b)). The information also alleged that Lincoln had a prior juvenile adjudication for a forcible lewd or lascivious act on a child under 14 (Pen. Code, §§ 288, subd. (b), 667, subd. (b)-(i), 1170.12), and that he had served two prior prison terms. (Pen. Code, § 667.5, subd. (b).)

On June 6, 2011, the court granted a prosecution motion to try appellant and codefendant Dowdell before dual juries in the same trial. At the request of the prosecution, the court ordered Shavens to testify under a grant of immunity. (Pen. Code, § 1324.) Jury selection began on June 7, and the evidentiary phase of the trial began on June 20. On July 1, the jury found Lincoln guilty as charged on all five counts, and Dowdell guilty on Counts One and Four. The jury hung on Counts Two and Three as to Dowdell, and the jury found the gun enhancement allegations not true as to both defendants.

As to Lincoln, the trial court imposed an aggregate term of life in prison with the possibility of parole, consecutive to four years, as follows. First, the court granted Lincoln's *Romero* motion to strike his prior adjudication. The trial court then found true the two prior prison sentences and imposed one-year enhancements for each. On each of Counts One, Two, and Four, the court sentenced Lincoln to concurrent terms of life in prison with the possibility of parole, but the court stayed the sentence on Count Four under section 654. On Count Three, the court sentenced Lincoln to the upper-term of

10

nine years and stayed the sentence under section 654.  On Count Five, the court sentenced Lincoln to a consecutive mid-term sentence of two years.  Thus, Lincoln's aggregate sentence consisted of life in prison with the possibility of parole consecutive to four years.

At Dowdell's sentencing, the prosecution moved to dismiss Counts Two and Three, and the trial court granted the motion in the interest of justice.  The court then sentenced Dowdell to life in prison with the possibility of parole on each of Counts One and Four, but the court stayed the sentence on Count Four under section 654.

## II. DISCUSSION

### A. *Admissibility of Lincoln's Statement to Police*

At trial, Lincoln moved to exclude his statement to police on the basis that police coerced him into involuntarily admitting his involvement in the crime.  After a hearing under Evidence Code section 402, the trial court denied the motion.  Lincoln contends the trial court erred in denying his motion.  The thrust of his argument is that the police made implicit promises of leniency for Dowdell, who was pregnant with Lincoln's child, in exchange for Lincoln's admissions.

#### 1. *Legal Standards*

"An involuntary confession is inadmissible under the due process clauses of both the Fourteenth Amendment to the federal Constitution [citation] as well as article I, sections 7 and 15 of the California Constitution [citation]." (*People v. Weaver* (2001) 26 Cal.4th 876, 920.)  "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession." (*People v. Massie* (1998) 19 Cal.4th 550, 576.)  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." (*Colorado v. Connelly* (1986) 479 U.S. 157, 167.)  "[T]he question in each case is whether the defendant's will was overborne at the time he confessed.  [Citations.]  If so, the confession cannot be deemed 'the product of a rational

11

intellect and a free will.' " (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534.)  The burden is on the prosecution to show by a preponderance of the evidence that the statement was voluntary.  (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.)  "When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness."  (*Ibid.*)

"Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise[] does not [. . .] make a subsequent confession involuntary."  (*People v. Boyde* (1988) 46 Cal.3d 212, 238 (*Boyde*).)  "However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law."  (*Ibid.*)  Furthermore, "A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid."  (*People v. Steger* (1976) 16 Cal.3d 539, 550.)

2.  *Lincoln Voluntarily Made His Statement to Police*

We agree with the trial court that the circumstances of the interrogation were "upsetting" but that Lincoln's admissions were voluntary under the totality of the circumstances.

At the start of the interrogation, police told Lincoln they had Dowdell in custody and that they had just questioned her about the crime.  They repeatedly emphasized the fact that she was pregnant with Lincoln's child:

"[LINCOLN:]  So you've already spoken to Brittany?  What are you gonna do for her?

"[OFFICER:]  For Brittany's sake?  I don't need you.  But you know who needs you, is uh, your little boy.  Okay.  Your little girl.  Brittany, she's pregnant with your child.

12

[¶]

"[OFFICER:]  Okay, how about the baby's [*sic*] Brittany's carrying?  How you think that's gonna affect her when she has that baby in prison?"

Second, police repeatedly emphasized that Dowdell was facing great liability for her involvement in the offense, including the possibility of life in prison, and they told Lincoln that "Brittany needs you" to "save her"—i.e., to make a statement lessening her liability:

"[OFFICER:]  You know what, we're in a position to burn her right?

[¶]

"[OFFICER:]  *Here's what's on the table.*  Okay.  Brittany goes for armed robbery, kidnapping with enhancement, okay, life."  (Italics added.)

[¶]

"[OFFICER:]  Armed robbery, kidnapping, okay.  It's a serious charge, okay.  We've been talking to Brittany's parents who came down here, okay.  Crying their eyes out, you know, because their kid got into this mess.  Their kid's pregnant, okay.  You want—*you want to know what's on the table?  That's what's on the table, okay.*  We need to know how involved she is.

"[LINCOLN:]  Life?

"[OFFICER:]  It's a serious charge.

"[LINCOLN:]  Life?

"[OFFICER:]  I don't know if it's gonna be life or not, but yeah, kidnapping, carjacking, armed to a murder weapon, robbery.  You're on probation.  You want, you want us to write about it that way?  We don't want to write that Brittany's the mastermind behind this.

[¶]

"[OFFICER:]  What you're dealing with also is, you're [*sic*] pregnant girlfriend is locked up for robbery for some shit that you pulled her into, 'cause obviously, you

influenced—into this, into this whole thing, but she has to say, she has to share some culpability and responsibility 'cause she's older than 18. She had to know what's going on. That's why she's busted. Do you understand? I don't need you. I don't need Brittany. Brittany needs you.

[¶]

"[OFFICER:] But hey, how are you gonna uh, save Brittany." (Italics added.)

The officers specifically emphasized the fact that Dowdell was facing an enhancement for use of a firearm, but that she was claiming the gun was a toy. Police insisted they needed Lincoln to corroborate her statement:

"[OFFICER:] Okay, she's facing armed robbery. She's trying to make a defense that was a fake gun, that it was a silver gun that was painted black, it was chipping away. Believable, but now she's the only one saying that right now. Okay? Can we go with her statement? No, man, she's our suspect. But she's saying, 'Ask him, he'll tell you. He'll tell you the exact same detail.' Okay. Armed robbery, we gotta go with that. Her first time out she's gonna have this baby in prison. She wants to terminate it? She's gonna be really sad. 'Cause she's not going to do that.

[¶]

"[OFFICER:] But once we get the truth from you, then we should just start talking about Brittany and see whatever you're saying about that case is true for Brittany and then we start discussing, okay, Brittany said, it was a painted gun, you know. . . ."

Throughout the interrogation, the police exhorted Lincoln to "do the right thing," to be the "voice" for Dowdell and "save her." They also repeatedly told Lincoln that his cooperation would "matter"—i.e., that it would result in a more positive outcome for Dowdell. After Lincoln told the officers that "you can't help me or hurt me" because the District Attorney was in charge, the officers insisted otherwise:

14

"[OFFICER:] I don't know what she- she's uh, playing a part in your life, but you gotta do the right thing, okay. *And you're wrong when it talks about cooperation and recommendations.*

[¶]

"[OFFICER:] I gotta put myself in your shoes. Even in that scenario, man, I gotta do the right thing. I gotta do the right thing for, for a young lady. Okay, I do this job because I protect people. I protect that victim, I'm the voice for that victim, I'm the voice for Brittany, I'm a voice for you, I'm a voice for Derric, I gotta do the right thing. This interview could have been done a long time ago. I gotta do the right thing. You gotta do the right thing. *And you're wrong. When you think that your voice and your opinion doesn't matter.*" (Italics added.)

Lincoln contends these statements constituted implicit promises of leniency for Dowdell. We agree. Based on our review of the recorded interrogation, we conclude that the officers' repeated statements of "what's on the table" in reference to Dowdell's exposure implicitly suggested leniency in exchange for Lincoln's statement. Moreover, the officers repeatedly told Lincoln that his statements would "matter" to Dowdell—i.e., that there would be a positive outcome for her as a result of his statements. While the officers' promises were not explicit, they specifically set forth the possibility of a firearm enhancement for Dowdell and implied that Lincoln could reduce that possibility by confirming her statement that the gun was a toy. These statements constituted "clearly implied" promises of leniency for Dowdell—the mother of Lincoln's child—and hence were improper. (*Boyde*, *supra*, 46 Cal.3d at p. 238; *People v. Steger*, *supra*, 16 Cal.3d at p. 550.)

To determine whether Lincoln's confession was coerced, we must assess whether the implicit promises of leniency *caused* the defendant to confess. (*Boyde*, *supra*, 46 Cal.3d at p. 238.) In this prong of the analysis, we consider Lincoln's sophistication, his prior experience with the criminal justice system, and his emotional state. (*In re Shawn*

15

*D.* (1993) 20 Cal.App.4th 200, 209.) Here, all of these factors weigh against a finding of coercion. First, Lincoln has a substantial criminal history, including four felony convictions for conspiracy, three convictions for possession of a controlled substance, and one misdemeanor conviction for driving with a suspended license. In his interrogation, Lincoln demonstrated familiarity with his legal rights and the interrogation process. He expressly volunteered to waive his *Miranda* rights before the police admonished him. Audio of the interview shows he was calm and rational throughout the interrogation. He made numerous statements demonstrating careful calculations about the details of his admissions in a deliberate effort not to incriminate Shavens.

We conclude that Lincoln's confession was not coerced by the officers' implicit promises of leniency. Because of his sophistication and experience with the criminal justice system, Lincoln knew the officers' implicit promises were hollow. In fact, he explicitly stated that he was aware the police lacked the authority to make charging decisions regarding Dowdell in exchange for his statements:

"[LINCOLN:] Well, gentlemen, ultimately, this is—right now, where I'm leaning; the only person who is qualified and capable of um, making any type of deals is the District Attorney."

Lincoln then reiterated this understanding, and the police responded that they could not make guarantees:

"[LINCOLN:] Okay. The only person that's in any position to make any deals and/or promises, um, regarding Brittany is the District Attorney. So as of right now, because we all share the same concern for her, I believe um, the only way that I would be willing to, in anyway, share anything uh, regarding this situation, is that I would, I would need to know that, I doing so—

"[OFFICER:] We can't guarantee you anything man.

"[LINCOLN:] I know, I know you can't. I know ya'll can't. And that's why I started by—by saying just the way I said it. I believe you—you—I mean, I talked to a lot

16

of police.  You know I did the good cop/bad cop, I did the asshole, I did the street cop, the motherfucker from the block, the nigga that know what's going on; I've dealt with all that.  You can't put a face on with me.  I'm not gonna put no faces on with ya'll."

These passages show that Lincoln gave his statement voluntarily.  But even if Lincoln could show his statement was coerced, we would find its admission harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).  As set forth above, the prosecution presented an abundance of evidence—apart from his statement—establishing Lincoln's guilt.  First, Shavens testified consistently and convincingly about the facts of Lincoln's involvement.  Cell phone records put Lincoln near the scene of the crime within minutes of its commission, and they show he made the subsequent phone calls to Toma.  Lincoln presented no evidence to corroborate his claim that Dowdell was dating another man at the time of the offense.  Furthermore, Lincoln admitted to being a convicted felon and a registered sex offender, and the prosecutor attacked his testimony effectively on cross-examination.  The jury was not likely to credit Lincoln's self-serving testimony.

On this record, even without hearing Lincoln's statement, the jury would have convicted Lincoln as charged based on the overwhelming evidence of his guilt.  Thus, even if we were to assume the statement should have been excluded, we would find that any error was harmless beyond a reasonable doubt.

B. *Prosecutorial Misconduct in Closing Argument Before the Lincoln Jury*

Closing arguments were given separately to the Lincoln and Dowdell juries.  In closing argument before the Lincoln jury, the prosecutor stated twice that "The presumption of innocence is over."  Lincoln's trial counsel lodged no objections.  Lincoln argues that the prosecution abnegated the presumption of innocence in violation of his due process rights, and that his trial counsel provided ineffective assistance of counsel by failing to object.

17

1. *Legal Standards*

"The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (*Estelle v. Williams* (1976) 425 U.S. 501, 503.) "To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process." (*Ibid.*) "The presumption of the innocence of an accused attends him throughout the trial, and has relation to every fact that must be established in order to prove his guilt beyond reasonable doubt. 'This presumption,' [the United States Supreme Court] has said, 'is an instrument of proof created by the law in favor of one accused, whereby his innocence is established, until sufficient evidence is introduced to overcome the proof which the law has created.' [Citation.]" (*Kirby v. United States* (1899) 174 U.S. 47, 55.) Moreover, "the presumption of innocence continues not only during the taking of the testimony, but during the deliberations of the jury and until they reach a verdict." (*People v. Arlington* (1900) 131 Cal. 231, 235 (*Arlington*).)

When prosecutorial misconduct "infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated." (*People v. Panah* (2005) 35 Cal.4th 395, 462 (*Panah*).) A prosecutor's conduct at trial may also constitute misconduct under state law if it involves the use of "deceptive or reprehensible methods to persuade the trial court or the jury." (*Ibid.*) " '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 284 [quoting *People v. Ochoa* (1998) 19 Cal.4th 353, 427].)

Generally, "[i]t is misconduct for the prosecutor to misstate the applicable law. . . ." (*People v. Boyette* (2002) 29 Cal.4th 381, 435.) However, "To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the

18

jury." (*People v. Brown* (2003) 31 Cal.4th 518, 553.)  There are two exceptions to forfeiture: (1) the objection or the request for an admonition would have been futile; or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct.  (*Panah*, *supra*, 35 Cal.4th at p. 462.)  A defendant claiming one of these exceptions must find support for it in the record.  (*Ibid.*)

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense.  [Citations.]  Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms.  [Citation.]  Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 (*Strickland*).)  " 'Finally, prejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)  "It is the defendant's burden on appeal [. . .] to show that he or she was denied effective assistance of counsel and is entitled to relief. [Citations.]  '[T]he burden of proof that the defendant must meet in order to establish his [or her] entitlement to relief on an ineffective-assistance claim is preponderance of the evidence.' [Citation.]" (*In re Hill* (2011) 198 Cal.App.4th 1008, 1016.)

2. *The Prosecutor's Misstatements of the Law*

Prior to closing arguments, the court instructed both juries, "A defendant in a criminal case is presumed to be innocent.  This presumption requires the people prove a defendant guilty beyond a reasonable doubt."  Subsequently, in closing argument before the Lincoln jury, the prosecutor twice argued that the presumption of innocence was

19

"over." First, he argued that "The evidence is overwhelming. My goal was to give [Lincoln] a fair trial, he just got one. You have the evidence. *The presumption of innocence is over.* I have the evidence. It wasn't a fair fight, it wasn't supposed to be. Go and deliberate, be thorough and come back guilty on all counts." (Italics added.) Similarly, he later argued that "It's fairly obvious that Mr. Lincoln committed all of the crimes we are accusing him of. *The presumption of innocence is over.* He has gotten his fair trial. Be thorough, deliberate, and come back with guilty verdicts on all counts." (Italics added.)

The Attorney General contends the prosecutor's comments were not improper, and that defendant forfeited his claim by failing to object. For the former proposition, the Attorney General relies on *Panah*, *supra*, 35 Cal.4th 395, and *People v. Goldberg* (1984) 161 Cal.App.3d 170 (*Goldberg*). In *Panah*, the prosecutor in closing argued that the evidence had "stripped away" the defendant's presumption of innocence. (*Panah*, *supra*, 35 Cal.4th at p. 463.) The California Supreme Court interpreted the prosecutor's remark as an argument that the strength of the prosecution's evidence had overcome the presumption of innocence, not as a legal statement about the presumption no longer applying. For this reason, the court found no prosecutorial misconduct.

In *Goldberg*, *supra*, 161 Cal.App.3d 170, the prosecutor told the jury in closing that "once the evidence is complete, once you've heard this case, once the case has been proven to you—and that's the stage we're at now—the case has been proved to you beyond any reasonable doubt. I mean, it's overwhelming. *There is no more presumption of innocence*. Defendant Goldberg has been proven guilty by the evidence." (*Id.* at p. 189, original italics.) In reasoning similar to the analysis in *Panah*, the Court of Appeal found the prosecutor's argument to be a rhetorical statement about the weight of the evidence, not an improper statement about the law. The court also noted that the jury had been properly instructed on the presumption of innocence, and held that "Once an otherwise properly instructed jury is told that the presumption of innocence obtains until

20

guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they*, as the fact-finding body, conclude guilt was proven beyond a reasonable doubt." (*Goldberg*, at pp. 189-190, original italics.)

Here, we find the prosecutor's statements distinguishable from those in *Panah* and *Goldberg*. First, it is indisputable that the prosecutor misstated the law. It is well established that the presumption of innocence continues into deliberations, and the presumption was in no sense "over" when the prosecutor declared it to be so. (*People v. Arlington*, *supra*, 131 Cal. at p. 235.) Second, the prosecutor *twice* made this misstatement of the law. Arguably, the first version of the statement—prefaced by a reference to the "overwhelming" state of the evidence—was comparable to the prosecutors' statements in *Goldberg* and *Panah*. But then the prosecutor repeated the misstatement, together with the assertions that it was "fairly obvious" Lincoln was guilty, and most critically, "*He has gotten his fair trial*." (Italics added.) This last statement implied that the "fair trial" was over, and with it, the jury's legal obligation to respect the presumption of innocence. Defense counsel should have objected. And if he had, the trial court should have sustained his objection and the court should have admonished the jury that the presumption of innocence remained in effect. The trial court properly instructed the jury on this point before jury deliberations. But the prosecutor should not have contradicted this instruction in his closing argument.

Trial counsel did not object when the prosecutor made the misstatements of law during closing argument, and Lincoln does not identify any portion of the record that would satisfy the two exceptions to forfeiture set forth in *Panah*, *supra*, 35 Cal.4th at page 462. The claim is therefore forfeited. As to the claim that his trial counsel is ineffective, Lincoln has not established prejudice—that is, he has not shown a reasonable probability of a more favorable outcome had his trial counsel objected to the remarks. As set forth above in Section II.A.2, the prosecutor presented abundant evidence of Lincoln's guilt on all counts. The weight of the evidence is even greater than that

21

described above given that the jury could properly consider Lincoln's admissions in his statement to police. Accordingly, we find no ineffective assistance of counsel based upon a failure to object to the prosecutor's misstatements of the law.[7]

C. *The Trial Court's Denial of Lincoln's Motion to Relieve Counsel*

Lincoln contends the trial court erred in denying his midtrial motion to relieve his retained counsel. He argues that the trial court improperly applied the standard for relief of *appointed* counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), instead of the standard for relief of *retained* counsel under *People v. Ortiz* (1990) 51 Cal.3d 975 (*Ortiz*). Lincoln contends that under *Ortiz*, the trial court should have granted his motion because he and his attorney were "embroiled in an irreconcilable conflict" resulting in ineffective representation. He argues that this error is structural and reversal is automatic, requiring no showing of prejudice.

Given the untimely nature of the motion and the inevitable disruption that would have followed from the relief of counsel midtrial, we find no abuse of discretion in the trial court's denial of Lincoln's motion to relieve his retained counsel.

1. *Procedural Background*

Jury selection began on June 7, 2011, and continued for five days until June 14. Opening arguments and presentation of evidence began on June 20. On June 22, the eighth day of trial, Lincoln moved to replace his retained counsel, Ron Berki. The trial court cleared the courtroom of all parties except for Lincoln and Berki, and held a hearing on Lincoln's motion. Lincoln stated that his rapport and communication with Berki were "very good," but Lincoln said he wanted to exercise greater strategic control over his case, and he expressed his disappointment with Berki's refusal to adhere to his desires. The trial court told Lincoln his options were to relieve Berki and represent himself, or

---

[7] Moreover, because we find no error in the admission of defendant's statement to police, we find no merit to Lincoln's claim that he was prejudiced by the cumulative harm from these asserted errors.

continue with Berki and "hopefully meet in the middle." Lincoln again expressed his frustration with Berki and complained that Berki was not examining witnesses with the questions Lincoln wanted him to ask. Lincoln asked if he would be given a law clerk or if he would be given leeway in posing questions, and the court told him he would have neither. The court then denied Lincoln's motion, which the court characterized as a "*Marsden* motion."

On June 27, 2011, after another day of trial, Lincoln again complained to the court about Berki's representation. Lincoln stated that Berki had given the prosecution information that Lincoln believed was subject to the attorney-client privilege. The prosecutor confirmed that Berki had shared the information with him, but Berki explained that he did so for the purpose of defending Lincoln. The court then told Lincoln that Berki was permitted to reveal privileged information for that purpose and explained, "Sometimes he has to do what's right for his client and I believe that was his intention." Berki then told the court, "I have been accused and maligned by my client throughout this whole trial that I am not working for him. I am not doing what he wants, that I am working in cahoots with the District Attorney. Your honor, I want to withdraw from this case. I mean it. I can't take this anymore. I can't do a job effectively for him if he is continuously doing everything he can to tie my hands." The court stated, "What I am going to do is let you think on this overnight and come back and we will talk about it tomorrow morning, because tempers are a little high right now. People are a little upset, and everybody will sleep on it, and come back, and let me know what you want."

The next morning, Lincoln read a prepared statement to the court outside the presence of the juries. Lincoln reiterated his claim that Berki had provided the prosecution with privileged information without Lincoln's permission. Lincoln stated, "Because of this violation, I can't imagine taking the witness stand in my own defense without wondering what other sacred communications have been relayed to the District Attorney or anyone else for that matter. Regardless, to whether an attorney trusts and/or

23

believes in his client's innocence it is imperative that the client be able to trust his attorney." Lincoln again moved to relieve Berki and moved for a mistrial.

The trial court denied the motion for a mistrial and found that, even assuming there had been a violation of attorney-client privilege, there was no prejudice to Lincoln. As to the motion to relieve counsel, the court again gave Lincoln the option of relieving Berki and representing himself. The court also ruled that no continuance would be granted and explained that "my fear and everybody's fear is that we are going to run out of jurors and it's going to drop below 12 and we are going to have to do this all over again and I don't think that's something anyone wants to do. So it's going to be done tomorrow one way or the other." Lincoln again complained about Berki's alleged violation of the attorney-client privilege. The court responded, "The only way he would be removed is that he was so incompetent that he fell below the level as a lawyer who should be doing his job and representing his client and he hasn't fallen below that threshold, because what he's done so far is he has represented you effectively and asked the right kind of questions, so I can't remove him. I don't have the reasons to. The law doesn't allow me to, but at any time you can decide you don't want him and you want to go at it on your own, that's your choice." Lincoln declined to represent himself, stating "Let's move forward."

2. *Legal Standards*

"The right of a criminal defendant to counsel and to present a defense are among the most sacred and sensitive of our constitutional rights." (*Ortiz*, *supra*, 51 Cal.3d at p. 982.) A nonindigent criminal defendant has a due process and Sixth Amendment right to retained counsel of his choice, and he can discharge retained counsel at any time with or without cause. (*People v. Verdugo* (2010) 50 Cal.4th 263, 310-311; *People v. Lara* (2001) 86 Cal.App.4th 139, 152 (*Lara*).) "[T]he right to counsel of choice reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain." (*Ortiz*, *supra*, at p. 983.)

24

"The right to discharge retained counsel is not absolute, however. . . ." (*Lara*, *supra*, 86 Cal.App.4th at p. 153.) The court must "balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution." (*Ibid.*) A defendant who seeks to discharge retained counsel in a timely manner ordinarily must be permitted to do so. (*Ortiz*, *supra*, 51 Cal.3d at p. 981; *Lara*, *supra*, at p. 152.) "However, a defendant who desires to retain his own counsel is required to act with diligence and may not demand a continuance if he is unjustifiably dilatory or if he arbitrarily desires to substitute counsel at the time of the trial." (*People v. Blake* (1980) 105 Cal.App.3d 619, 623-624.) "A criminal defendant's right to decide how to defend himself should be respected unless it will result in 'significant prejudice' to the defendant or in a 'disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' " (*Ortiz*, *supra*, at p. 982.) The erroneous denial of a motion to substitute counsel constitutes structural error and mandates reversal of the defendant's conviction without requiring a showing of prejudice. (*Id.* at p. 988.) However, we apply an abuse of discretion standard of review to a trial court's denial of a motion to relieve retained counsel.[8] (*People v. Verdugo, supra,* 50 Cal.4th at p. 311; *People v. Trapps* (1984) 158 Cal.App.3d 265, 271; cf. *Lara*, *supra*, at pp. 153-154.)

3. *The Trial Court Did Not Err By Denying Lincoln's Motion to Relieve Berki*

Lincoln argues that the trial court erroneously treated his motion under the standard set forth in *Marsden*, *supra*, 2 Cal.3d 118, because *Marsden* applies to appointed counsel, and Berki was retained. "The trial court's improper reliance on *Marsden*, however, does not mean that appellant is entitled to the automatic reversal of his conviction." (*Lara*, *supra*, 86 Cal.App.4th at p. 155.) Even under the proper standard,

---

[8] The abuse of discretion standard of review is particularly appropriate here because the trial court's ruling was tantamount to a denial of a continuance. (See *People v. Johnson* (1970) 5 Cal.App.3d 851, 858-859 [applying abuse of discretion standard of review to denial of continuance needed to seek private counsel].)

25

set forth in *Ortiz*, *supra*, 51 Cal.3d 975, a trial court does not abuse its discretion if the defendant's motion is untimely and would result in " 'disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' " (*Id.* at p. 982 [quoting *People v. Crovedi* (1966) 65 Cal.2d 199, 208].)

We conclude that Lincoln's motion was untimely. The court spent five days selecting two juries for a complex, two-defendant trial.[9] Lincoln made his first request to relieve Berki eight days into trial, after the prosecution had already presented the bulk of its evidence. The court implicitly found that granting Lincoln a continuance long enough to retain new counsel could cause an unreasonable "disruption of the orderly processes of justice" from the loss of too many jurors.[10]

Lincoln argues that the record does not support a finding that his motion was untimely. But the record shows the trial lasted nearly a month because it dealt with complex legal issues, numerous witnesses and exhibits, and hours of recorded audio. A competent attorney would have required substantial time to prepare before substituting for Berki. Had the court relieved Berki, a significant delay in the proceedings would have been required.

Lincoln is correct that he and Berki had expressed frustration with each other. But their conflicts were not so irreconcilable as to warrant such a lengthy and disruptive delay. In Lincoln's initial motion to relieve counsel on June 22, his complaints about Berki focused solely on strategic and tactical disagreements; Lincoln actually characterized their working relationship positively. Lincoln's second motion, made on June 27, centered on an alleged violation of the attorney-client privilege, which the trial court properly rejected. It is true that Berki expressed his own doubts about his ability to

_____

[9] The court granted the prosecution's motion for dual juries in part because Shavens, a key prosecution witness, was suffering from a serious illness, and the court was concerned about delay that would be caused if the trials were to proceed separately.

[10] One juror had previously asked to be excused by July 1. The court was later required to excuse the juror and seat an alternate juror on June 30.

26

continue representing Lincoln effectively, but the record shows that he represented Lincoln effectively throughout the entire trial.  Berki cross-examined the prosecution's witnesses aggressively, he effectively lodged objections, and he put forth a strong closing argument.  As the trial court noted, many of the defense tactics that Lincoln disputed appeared to be based on Berki's wisdom and experience, and the use of these tactics likely benefited Lincoln.[11]

On these facts, we find no abuse of discretion in the trial court's denial of Lincoln's motion to relieve his trial counsel.  We therefore reject this claim.

D. *Sentencing on Counts One and Two Under Section 654*

The trial court sentenced Lincoln to concurrent terms of life in prison with the possibility of parole on both Count One (kidnapping for extortion) and Count Two (kidnapping for carjacking).  The court stayed the sentence of life with parole on Count Four (kidnapping for robbery) under section 654.  Lincoln contends the trial court also should have stayed one of the two sentences for Counts One and Two under section 654 because the two offenses were committed during the same indivisible transaction with the common objective of obtaining money.  Reasonable minds can differ as to whether the offenses occurred during a single, indivisible transaction, but we agree with Lincoln that he committed both offenses with a single intent and objective.  Under this standard, the court should have stayed one of the two sentences.  (*Neal v. State of California* (1960) 55 Cal.2d 11, 19 (*Neal*) [overruled in part on another ground as stated in *People v. Correa* (2012) 54 Cal.4th 331].)

1. *Legal Standards*

Section 654, subdivision (a) provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the

---

[11] At a later hearing, after Lincoln made alternating requests to represent himself, then for appointment of counsel, and then again to represent himself, the trial court found that Lincoln's conduct showed a "pattern of manipulating the system."

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 thereby bars the imposition of multiple sentences for a single act or omission, even though the act or omission may violate more than one provision of the Penal Code. (*People v. Mesa* (2012) 54 Cal.4th 191, 195.) This is true even where the court orders multiple sentences to be served concurrently. "It has long been established that the imposition of concurrent sentences is precluded by section 654 [citations] because the defendant is deemed to be subjected to the term of *both* sentences although they are served simultaneously." (*People v. Miller* (1977) 18 Cal.3d 873, 887 (*Miller*) [disapproved on another ground in *People v. Oates* (2004) 32 Cal.4th 1048, 1068, fn. 8].) Instead, the accepted "procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable." (*Miller*, *supra*, at p. 886.) "The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability." (*Neal*, *supra*, 55 Cal.2d at p. 20.)

"[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] Whether a course of conduct is indivisible depends upon the intent and objective of the actor. [Citation.] If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Perez* (1979) 23 Cal.3d 545, 551.) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*Ibid.*) Conversely, where reasonable minds can differ on whether multiple crimes involve a single act, we consider whether the crimes were focused on a single "intent and

objective." (*Neal*, *supra*, 55 Cal.2d at p. 19; *People v. Latimer* (1993) 5 Cal.4th 1203, 1205-1206.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal*, *supra*, 55 Cal.2d at p. 19.) By contrast, "If [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he [or she] may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

"Whether the facts and circumstances reveal a single intent and objective within the meaning of Penal Code section 654 is generally a factual matter; the dimension and meaning of section 654 is a legal question." (*People v. Guzman* (1996) 45 Cal.App.4th 1023, 1028.) We apply the substantial evidence standard of review to the trial court's implied finding that a defendant harbored a separate intent and objective for each offense. (*People v. Braz* (1997) 57 Cal.App.4th 1, 10; *People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

2. *Section 654 Requires a Stay of the Sentence on Count One or Count Two*

Lincoln contends that his offenses occurred during one continuous, indivisible course of action with the sole objective to obtain money. Lincoln's argument focuses exclusively on his initial abduction of Toma and the movement of Toma's truck. First, Lincoln notes that the offense of kidnapping during a carjacking was not complete until the carjacking was complete, which in turn required the vehicle to be moved. (*People v. Contreras* (1997) 55 Cal.App.4th 760, 765 [kidnapping during commission of carjacking requires completed offense of carjacking]; *People v. Medina* (2007) 41 Cal.4th 685, 693; *People v. Lopez* (2003) 31 Cal.4th 1051, 1061-1063 [carjacking requires movement of the vehicle].) Similarly, Lincoln notes that the offense of kidnapping for extortion was

29

also completed when the vehicle was first moved. He argues that whatever slight movement of Toma might have occurred when Lincoln initially forced Toma into the back of the truck was merely "incidental to the commission of the [extortion]." (*People v. Daniels* (1969) 71 Cal.2d 1119, 1139 [kidnapping for robbery requires more than mere movement of the victim incidental to the commission of the robbery].) Thus, Lincoln argues, both offenses were complete at the moment Lincoln moved the truck, and both offenses occurred during the same act of kidnapping.

Lincoln's characterization of these facts ignores subsequent events. After stopping at the first ATM, Lincoln and Dowdell were unable to extract money from it. Lincoln threatened Toma again, whereupon Toma begged them to go to a Bank of America ATM. Lincoln and Dowdell then drove the truck and the victim to a second ATM location. Thus, the crime arguably consisted of multiple acts, as compared to a single indivisible act. But where reasonable minds can differ as to whether the defendant's conduct entailed more than one act, we must consider whether he acted with a single intent and objective. (*Neal*, *supra*, 55 Cal.2d at p. 19; *People v. Latimer*, *supra*, 5 Cal.4th at pp. 1205-1206.) In that respect, the evidence shows Lincoln's intent was singular. Throughout the course of the kidnapping, Lincoln's sole objective was to obtain money. When the police, in their interrogation, questioned Lincoln as to his motive, he told them it was money, and that his plan prior to the robbery was to "try and get a purse or wallet." Lincoln made this abundantly clear to the victim as well, with constant, repeated demands for money throughout the course of the crime.

The Attorney General argues that Lincoln took the victim's truck because Lincoln was "motivated by a desire to avoid detection" after Toma resisted the initial abduction. Even if Lincoln sought to avoid detection, that tactic was merely incidental to his primary goal of getting Toma's money. We find no substantial evidence for the proposition that Lincoln harbored any other intent or objective "independent of and not merely incidental to" the acquisition of money. (*People v. Beamon*, *supra*, 8 Cal.3d at p. 639.) Under

30

*Neal*, then, section 654 requires a stay of one of the two sentences. Accordingly, we will order that the sentence on Count Two be stayed.

E.   *Carjacking as a Lesser Included Offense of Kidnapping During a Carjacking*

The jury also found Lincoln guilty of both carjacking (Pen. Code, § 215) and kidnapping during a carjacking (Pen. Code, § 209.5). Lincoln contends the trial court should have dismissed the conviction for carjacking because it is a lesser included offense of carjacking during a kidnapping. The Attorney General concedes this claim and agrees that we should reverse the conviction for carjacking.

We accept the Attorney General's concession. It is well settled that carjacking is a necessarily included offense of kidnapping during a carjacking. (*People v. Jones* (1999) 75 Cal.App.4th 616, 624-625; *People v. Contreras*, *supra*, 55 Cal.App.4th at p. 765.) When a defendant is convicted of a greater and a lesser included offense, reversal of the conviction for the lesser included offense is required. (*People v. Pearson* (1986) 42 Cal.3d 351, 355.) Therefore, we will strike Lincoln's conviction for carjacking (Count Three).

F.   *Jury Instructions Regarding Evidence of Intimate Partner Battering*

Dowdell, who presented evidence of intimate partner battering at trial, contends that the trial court erroneously and prejudicially instructed the jury on the permissible uses of the evidence. Dowdell requested a special instruction that would have allowed the jury to consider evidence of intimate partner battering in deciding whether she formed the specific intent required for the charged offenses. But the trial court limited the jury's use of such evidence to deciding whether Dowdell committed the crime to defend herself from an immediate threat of great bodily injury or death, not whether she formed the specific intent to commit the crimes. Dowdell argues that by limiting the jury's ability to consider the evidence in this fashion, the trial court violated her federal due process right to present a defense, requiring harmless error analysis under the federal standard set forth in *Chapman*, *supra*, 386 U.S. 18. We agree that the court erred, but we conclude that the

31

appropriate harmless error analysis is the state law standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). We conclude that the error was harmless under the *Watson* standard.

    1. *Procedural Background*

In pretrial motions and again at trial, Dowdell requested special instructions regarding intimate partner battering. As relevant here, she requested the following instruction: "You have heard testimony from (Linda Skerbec/Dr. Mary Ann Kim) regarding the effect of battered women's syndrome and/or intimate partner battering, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence. You may consider this evidence in deciding whether the defendant's conduct was consistent with the conduct of someone who has been abused, in evaluating the believability of defendant's testimony, and in determining *whether the defendant possessed the specific intent necessary to commit the crimes charged*." (Italics added.)

The trial court rejected Dowdell's proposed instructions and instructed the Dowdell jury with a combination of CALCRIM No. 851 and CALJIC 9.35.1. As relevant here, the court instructed the jury, "You are [*sic*] heard evidence regarding battered woman's syndrome, also known as intimate partner battering. You should consider this evidence for a certain limited purpose only, namely, you may consider this evidence only in deciding whether the battered woman's syndrome applied in this case; and *whether the defendant actually believed that she needed to commit the charged crimes in order to defend herself against an immediate threat of great bodily injury or death*; and if so, whether the defendant's belief was reasonable or unreasonable." (Italics added.) The court then defined "immediate" and instructed the jury on reasonableness in the context of intimate partner battering.

Prior to sentencing, Dowdell moved for a new trial on the ground that the court erred by limiting the jury's consideration of intimate partner battering to the issue of

whether she acted under duress, and not whether she otherwise formed the specific intent to commit the charged offenses. The trial court set forth its reasoning for instructing the jury as above and denied Dowdell's motion.

2. *Legal Standards*

"Under appropriate circumstances, 'a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99 (*Coffman*) [quoting *People v. Bolden* (2002) 29 Cal.4th 515, 558].) In determining whether the evidence is sufficient to warrant a jury instruction, the court does not determine the credibility of the defense evidence, but only whether there was evidence, if believed by the jury, sufficient to raise a reasonable doubt. (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

We apply a de novo standard of review in assessing whether jury instructions correctly state the law or whether they effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "[T]he proper test for judging the adequacy of instructions is to decide whether the jury was fully and fairly instructed on the applicable law." (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.)

3. *The Trial Court Erroneously Instructed the Jury on Intimate Partner Battering*

Dowdell relies on *Coffman*, *supra*, 34 Cal.4th 1, for the proposition that the trial court should have instructed the Dowdell jury that it could consider evidence of intimate partner battering in determining whether she formed the requisite specific intent. In *Coffman*, the prosecution charged Coffman and her codefendant with murder, kidnapping, kidnapping for robbery, robbery, residential burglary, and forcible sodomy.

33

(*Id.* at p. 16.)  The trial court instructed the jury that it could consider evidence of intimate partner battering solely for the purpose of determining whether Coffman had actually formed the mental state required for these offenses as well as the special circumstance allegations.  (*Id.* at p. 98)  The trial court further instructed that a person is not guilty when the person is acting under threats or menaces that would cause a reasonable person to fear that his or her life would be in immediate danger if he or she did not engage in the conduct charged.  (*Ibid.*)  The California Supreme Court held that these instructions were correct: "We conclude the instructions given here correctly and (with one exception) [12] adequately informed the jury that it could consider the evidence of battered woman syndrome *in determining whether Coffman had formed the mental state or specific intent required for the charged offenses. . . .*"  (*Id.* at p. 99, italics added.)  Neither the trial court's instructions in *Coffman* nor the Supreme Court's holding in that case limited the applicability of intimate partner abuse evidence to a determination of duress.

The wording of Dowdell's proposed instruction closely tracked the applicable language in *Coffman*.  Although the instruction ultimately given to the jury relied on the language set forth in the pattern jury instructions, the trial court did not apply the Judicial Council Bench Notes to CALCRIM 851, which cite to the above holding from *Coffman*, as follows: "The court may need to modify this instruction if the defense offers testimony on intimate partner battering and its effects on an issue other than whether the defendant actually and reasonably believed in the need for self-defense.  (See *Coffman*, [*supra*,] 34 Cal.4th [at pp.] 98-101 [citation] [evidence offered to show defendant did not act with intent to kill but acted out of fear of codefendant].)"  (Judicial Council of Cal., Crim. Jury Instns., (2013) Bench Notes to CALCRIM No. 851 (1st ed. 2013).)  The Attorney General argues that the supplied instructions *did* allow the jury to consider whether

---

[12] The exception concerned duress as a defense to felony murder, which is not relevant here.

34

Dowdell form specific intent because the court instructed on duress, and duress negates intent. *Coffman*, however, allows the jury to consider intimate partner abuse as it pertains to specific intent even absent a finding of duress. For this reason, we conclude that Dowdell's proposed instruction properly stated the law under *Coffman*.

Furthermore, Dowdell presented substantial evidence sufficient to warrant such an instruction. First, there was substantial evidence to establish that Dowdell suffered from intimate partner abuse. She testified that Lincoln controlled many aspects of her life through emotional manipulation, dominating behavior, and threats to her family. She testified—and Lincoln confirmed—that he once struck her during sex. She presented several witnesses who corroborated the abusive and controlling nature of her relationship with Lincoln, and she presented testimony from two experts who offered opinions supporting this characterization.

Second, Dowdell testified that she did not intend to rob, kidnap, or carjack Toma. She testified that she was merely following Lincoln's commands, and that she was afraid he would hurt her if she did not comply. She further testified that when she initially entered Toma's truck, she did not know that Lincoln intended to drive the truck or kidnap Toma. Although Dowdell's testimony was self-serving and aspects of it were contradicted by other evidence, we do not consider the credibility of a witness's testimony in determining whether the record holds substantial evidence to warrant a particular jury instruction. (*People v. Salas*, *supra*, 37 Cal.4th at p. 982.) If the jury had believed Dowdell's testimony, in conjunction with the evidence of intimate partner abuse, this evidence would have been sufficient to support a reasonable doubt about whether she had formed the specific intent required to commit the charged offenses. Hence, it was the jury's role, not the court's role, to make that determination. We therefore conclude that the trial court erred in not allowing the jury to consider evidence of intimate partner abuse for the purpose of assessing whether Dowdell formed the specific intent required to commit the charged crimes.

4. *Harmless Error Analysis*

Dowdell contends we must reverse her convictions unless the error is shown to be harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. at page 24. She argues that the proper standard for prejudice is set forth under *Chapman* rather than *Watson*, *supra*, 46 Cal.2d 818, because the erroneous instruction violated her federal due process right to present a defense. But the California Supreme Court has specifically rejected this argument in the context of an instructional error concerning intimate partner abuse. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1089 (*Humphrey*).)

In *Humphrey*, the defendant offered evidence of intimate partner abuse to support a claim of self-defense. The trial court instructed the jury that it could consider the evidence in deciding whether the defendant believed it was necessary to kill in self-defense, but not in deciding whether that belief was reasonable. (*Humphrey*, *supra*, 13 Cal.4th at p. 1076.) The Supreme Court held that the latter portion of this instruction was erroneous. (*Id.* at p. 1089.) But the court rejected the defendant's argument that the erroneous instruction deprived her of the right to present a defense. The court reasoned, "The erroneous instruction may have adversely *affected* the defense, but it did not deprive her of the right to present one or deny her equal protection. In effect, the [trial] court excluded some evidence as to one element of the defense. When the reviewing court applying state law finds an erroneous exclusion of defense evidence, the usual standard of review for state law error applies: the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant." (*Ibid.*, original italics.)

Like the trial court in *Humphrey*, the trial court here did not prevent Dowdell from presenting a defense; indeed, she introduced substantial evidence demonstrating intimate partner abuse. Rather, the court effectively excluded the evidence as to the element of specific intent in the absence of duress. Accordingly, we will apply the *Watson* standard for prejudice.

36

Under the *Watson* standard, we conclude Dowdell has not met her burden of showing a reasonable probability of a more favorable outcome had the jury been properly instructed. Dowdell presented abundant evidence demonstrating the emotionally and psychologically abusive nature of her relationship with Lincoln in the months preceding the crime. But the issue for the jury concerned her intent during the charged offense. Furthermore, the evidence specific to her conduct during the crime shows she was not so tightly controlled by Lincoln that she acted without the requisite specific intent—e.g., that she acted as an automaton without intending to engage in the kidnapping and robbery. Most significantly, her own testimony on this point was self-serving and contradicted by other facts; therefore, the jury was not likely to be persuaded by it. The record shows that it is not reasonably likely the jury would have found in Dowdell's favor had it been allowed to consider whether intimate partner battering negated the specific intent necessary for the charged offenses. Accordingly, we conclude the error was harmless.

Harmless error aside, the outcome here—imposition of a life sentence notwithstanding Dowdell's comparatively lesser culpability—is a cause for concern. This sentiment was apparently shared by the trial court. In pretrial discussions, the trial court suggested that an appropriate disposition would result in a total sentence of seven years, less time served—a proposal agreed to by defense counsel, but rejected by the prosecution. At sentencing, the trial court, as required by law, imposed life in prison with the possibility of parole, but the court advised Dowdell she should be released in five years with good behavior. It is difficult to square such a statement with the imposition of a life sentence, but like the trial court, we are bound by the law, and so we will affirm this sentence.

G. *Prosecutorial Misconduct in Closing Argument Before the Dowdell Jury*

In his closing argument to the Dowdell jury, the prosecutor stated, "You are not to consider punishment. The judge is to consider punishment whether she goes to jail or

whether she gets probation, that's not—" Defense counsel immediately objected, and the trial court instructed the jury, "Ladies and gentlemen, you are not to consider anything regarding penalty or punishment, that's my job, not the jurors' job." The prosecutor then stated, "That's what I said. You are not to consider that, that's outside your purview."

Dowdell contends the prosecutor's reference to probation constituted prosecutorial misconduct requiring reversal. Dowdell argues that the prosecutor's mere mention of probation introduced the possibility of leniency into jurors' minds and suggested that they need not be concerned about the harshness of the charges. Dowdell contends this was part of an intentional strategy by the prosecutor designed to encourage jurors to ignore the evidence of Lincoln's psychological control over Dowdell.

Even assuming the prosecutor's statement constituted misconduct, we conclude the misconduct was harmless. First, it was not the case that the misconduct "infect[ed] the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process. . . ." (*Panah*, *supra*, 35 Cal.4th at p. 462.) "[T]he question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Ayala*, *supra*, 23 Cal.4th at p. 284.) In answering this question, we note that the trial court properly admonished the jury not to consider punishment. (*People v. Thomas* (2011) 51 Cal.4th 449, 487 [no harm from prosecutor's comment regarding penalty where the court promptly admonished the jury].) We presume the jury heeded the court's instructions. (*Ibid.*)

Furthermore, as set forth above, the evidence of Dowdell's guilt was strong. She admitted participating in the offenses, and surveillance video from the ATM placed her at the scene of the crime. Her sole defense—that she did not intend to rob or kidnap Toma but was merely following Lincoln's orders—was not credible. Therefore, it is not reasonably likely the jury applied the prosecutor's remark in an objectionable fashion. The jury likely rejected Dowdell's defense based solely on the weight of the evidence against her. Accordingly, we find this claim without merit.

38

H. *Correction of the Abstract to Reflect the Trial Court's Oral Pronouncement*

Dowdell contends her sentence on Count Four must be stayed under section 654. At sentencing, the trial court pronounced the sentence on Count Four stayed under section 654, but the abstract of judgment incorrectly indicates the sentence is to be served concurrently with the sentence on Count One. The Attorney General concedes the error.

We accept the Attorney General's concession. "An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Accordingly, we will order the abstract corrected.

## III.   DISPOSITION

As to Lincoln, the sentence of life in prison with the possibility of parole for Count Two is stayed, and the conviction for carjacking on Count Three is stricken. As to Dowdell, the trial court shall correct the abstract of judgment to reflect that the trial court stayed the sentence on Count Four. The corrected abstract shall be forwarded to the Department of Corrections and Rehabilitation. As modified, both judgments are affirmed.

_____

MÁRQUEZ, J.

We concur:

_____

RUSHING, P.J.

_____

PREMO, J.

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court Nos.: EE907147, CC501296 and CC754220 |
| Trial Judge: | The Honorable Paul R. Bernal |
| Attorney for Defendant and Appellant Brittany Kim Dowdell: | Eric Weaver under appointment by the Court of Appeal for Appellant |
| Attorney for Defendant and Appellant Terrance Ray Lincoln: | Jonathan E. Berger under appointment by the Court of Appeal for Appellant |
| Attorneys for Plaintiff and Respondent The People: | Kamala D. Harris, Attorney General |
| | Dane R. Gillette, Chief Assistant Attorney General |
| | Gerald A. Engler, Senior Assistant Attorney General |
| | Jeffrey M. Laurence, Supervising Deputy Attorney General |
| | Alisha M. Carlile, Deputy Attorney General |

People v. Dowdell, et al.
H037404