[No. H015235. Sixth Dist. Aug. 15, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
PATRICIA ANN BRAZ, Defendant and Appellant.

**COUNSEL**

Robert Spertus, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Amy Haddix, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ELIA, Acting P. J.**—A jury found appellant guilty of two counts of child endangerment (Pen. Code, § 273a, former subd. 1) and one count of second degree burglary (Pen. Code, §§ 459-460). The jury found appellant not guilty of murder and a mistrial was declared as to a charge of involuntary manslaughter on which the jury was deadlocked. Appellant was sentenced to state prison for eight years. On appeal, she contends that her burglary conviction must be reversed because of instructional error, legal impossibility and that the statute prohibiting the fraudulent use of a credit card supersedes the general burglary statute. She further contends that the trial court erred by failing to stay punishment for one count of child endangerment because there was no substantial evidence supporting the finding that there were two distinct acts of child endangerment. We affirm.

On January 18, 1993, at 12:20 a.m., police, paramedics and firefighters went to the Oasis Motel in response to appellant's 911 call. Appellant's

two-year-old son, Anthony S., was not breathing and had no pulse or blood pressure. He was taken to the hospital, and an emergency room physician worked on him until pronouncing him dead at 1:29 a.m. The physician noticed bruises on Anthony's body which looked like they had been sustained at different times. Dr. Vaneghi of the Santa Clara County Coroner's Office, who performed the autopsy, and several other doctors who examined Anthony's medical records, concluded that Anthony died of massive internal bleeding caused by tremendous blunt force trauma to the abdomen and liver.

Appellant had been living with Anthony and her boyfriend, William Harrell, at the Oasis Motel since January 1, 1993. In their room, police found several automated teller machine (ATM) printouts and a wallet belonging to Michael Dodge. Under questioning, appellant admitted trying to use the ATM card in the bank machine.

■ Appellant contends that her burglary conviction must be reversed because of instructional error. On November 8, 1995, the trial court instructed the jury regarding burglary and two lesser offenses, violations of Penal Code sections 484e (theft of ATM card) and 484g (unlawful use of ATM card). As to burglary, the trial court instructed the jury that "Every person who enters any building or ATM machine with the specific intent to steal, take and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of such property, is guilty of the crime of burglary in violation of Penal Code section 459."

The court further instructed the jury on the two crimes of unlawful use of an ATM card and theft of an ATM card as follows: "As to the lesser crime of unlawful use of an automatic teller machine card, I instruct you as follows: [¶] Every person who, with intent to defraud, uses an automatic teller machine card for the purpose of obtaining money, goods, services, or anything else of value, knowing that the card was lost or mislaid, is guilty of theft. Where nothing of value is obtained, the crime is petty theft. . . . [¶] As to the lesser crime of theft of an automatic teller machine card, I instruct you as follows: [¶] Every person who acquires an automatic teller machine card that he or she knows to have been lost or mislaid, and retains possession with intent to use it or to sell it or to transfer it to a person other than the issuer or the cardholder is guilty of petty theft."

During the course of their deliberations this jury sent several notes to the court concerning the elements of other counts, the readback of testimony and

scheduling issues. On November 20, the court responded to a question from the jury concerning the lesser offenses. The jury sent a note saying, "[w]e're unable to reach a final agreement on burglary. There was some concern that the fact no money was received reduces the charge to petty theft. [¶] Should petty theft be considered as part of the burglary charge or is it a lessor [*sic*] charge to the burglary charge?"

In response to this note, the court commented that it believed (mistakenly) that it hadn't read the lesser charges to the jury. It then informed the jury that "there are two lesser offenses as to count four [the burglary]." The court then read the same instructions quoted above; however, the court substituted the Penal Code section numbers 484e and 484g in place of the words "petty theft" in the concluding phrase of each definition.[1] The court then told the jury "you don't get to the lessers unless you find as to the underlying offense." The court read the definition and elements of burglary and commented "[t]here is no element requiring the taking of money as long as the specific intent is present at the time . . . . It is immaterial whether the intent with which the entry was made was thereafter carried out . . . ."

Appellant contends that the court's reading of this abridged version of the instructions on the lesser offenses, leaving out the reference to "the crime of petty theft," was error. Appellant argues that the reference to petty theft was obviously what the jury had in mind in its note, and that the court's response, omitting petty theft and rereading the burglary instruction with special emphasis on taking of money and intent, directed the jury to convict appellant of burglary.

We are not persuaded that the court's response to the jury's note presented the jury with "a set of legally insufficient instructions which virtually directed them to find the defendant guilty of burglary." The note concerned the elements of burglary, in particular, whether an actual taking must occur for burglary to be completed. This is precisely the point the court addressed. The court's instructions were potentially better for appellant, in that the court used the Penal Code section numbers in describing the lesser offenses, in conformity with their wording on the verdict forms. This was actually clearer than repeating the reference to petty theft, when those words were not on the verdict form. There was no error in the manner in which the court responded to the jury note.

■ Appellant contends it is legally impossible to commit a burglary by inserting an ATM card into a bank machine without knowledge of the

---

[1]The court switched Penal Code section 484g and section 484e, subdivision (e), when it reread these instructions, but appellant concedes this is harmless.

personal identification number (PIN) which activates the card. During trial, appellant testified that she inserted Michael Dodge's ATM card into the bank ATM and entered random numbers for the PIN. Six ATM receipts for failed transactions were found in appellant's hotel room. Appellant testified that after her codefendant found the wallet, he wanted to go to the bank and try to get money from the ATM. She said "I didn't have a code number. I was just punching anything. I told him that it was stupid to go, and I just was going to go to make a point." When they returned to the motel, she twice called the 800 number on the card. She said "It was ridiculous and it was stupid to go [to the bank] . . . but Willie [the codefendant] had been bugging me about it."

In support of her argument that it was legally impossible to commit burglary in this way, appellant cites *People* v. *Meyer* (1985) 169 Cal.App.3d 496, 504-505 [215 Cal.Rptr. 352]. In *Meyer*, the court explained "The difference between factual impossibility . . . and the legal impossibility for which defendant in the instant case argues is apparent in the decision in *People* v. *Meyers* (1963) 213 Cal.App.2d 518, 523 . . . , where the court stated: 'The courts of this state have not concerned themselves with the niceties of distinction between physical and legal impossibility, but have focused their attention on the question of the specific intent to commit the substantive offense. The hypothesis of the rule established in this state is that the defendant must have the specific intent to commit the substantive offense, and that under the circumstances, as he reasonably sees them, he does the acts necessary to consummate the substantive offense; but because of circumstances unknown to him, essential elements of the substantive crime are lacking. [Citations.] It is only when the results intended by the actor, if they happened as envisaged by him, would still not be a crime, then and only then, can he not be guilty of an attempt.' (See also *People* v. *Peppars* (1983) 140 Cal.App.3d 677, 687, fn. 5 . . . [' " 'Legal impossibility' denotes conduct where the goal of the actor is not criminal, although he believes it to be. 'Factual impossibility' denotes conduct where the objective is proscribed by the criminal law, but a circumstance unknown to the actor prevents him from bringing it about." . . .'].)"

The issue of legal impossibility invites discussions of factual impossibility and the sufficiency of the evidence to prove specific intent. *Meyer* focuses our attention on whether the results intended by appellant, if they happened as she envisioned them, would be a crime. Appellant testified she was just trying to show Harrell that she wouldn't be able to obtain money from the account without the PIN. The jury was free to determine that, despite her testimony, she shared Harrell's intent to obtain money, but just not his

qoptimism that she might come up with the correct sequence of numbers. She stood in the rain at the ATM machine for 15 minutes trying 6 different combinations. The jury could view this evidence as suggesting a more methodical approach to determining the correct PIN than rapidly entering a series of numbers in a short period time to convince Harrell it was useless to try to obtain money this way. This was circumstantial evidence of her intent to take Dodge's money. There were no "essential elements of the crime lacking" due to "circumstances unknown to [appellant]." Although the odds may not have been in her favor, it was not legally impossible for appellant to commit burglary under these circumstances.

■ Appellant contends that Penal Code section 484g is a special statute precluding the application of the burglary statute. Appellant states that her actions necessarily constituted a violation of section 484g. At the time of appellant's offense, that section provided: "Every person, who with intent to defraud, (a) uses for the purpose of obtaining money, goods, services or anything else of value an access card obtained or retained in violation of Section 484e or an access card which he or she knows is forged, expired, or revoked, or (b) obtains money, goods, services or anything else of value by representing without the consent of the cardholder that he or she is the holder of an access card or by representing that he or she is the holder of an access card and the card has not in fact been issued, is guilty of theft. If the value of all money, goods, services and other things of value obtained in violation of this section exceeds four hundred dollars ($400) in any consecutive six-month period, then the same shall constitute grand theft."

The distinction between general and special statutes is, rather than a rule of substantive law, a tool to effect legislative intent. When a particular statute covers much the same topic as a general law, it is an indication that the Legislature intended the more specific provision to apply. However, the legislative history of this section indicates the Legislature, in enacting this section and related sections (Pen. Code, § 484d et seq.), did not intend to preclude application of the burglary statute or any other statute. This history is summarized in *People* v. *Butler* (1996) 43 Cal.App.4th 1224, 1243-1244 [51 Cal.Rptr.2d 150]. "[I]n 1967 the Legislature repealed section 484a and replaced it with comprehensive credit card legislation, new section 484d et seq. The new statute contained an uncodified section 8 which read: 'This act shall not be construed to preclude the applicability of any other provision of the criminal law of this state which presently applies or may in the future apply to any transaction which violates this act.' (Stats. 1967, ch. 1395, § 8, p. 3260.) The report of the 1967 Assembly Committee on Criminal Procedure states at page 16: 'Section 9 [ultimately section 8] of the bill provides

that any transaction which violates the terms of this bill and at the same time violates any other provision of the law is prosecutable under *either* provision.' (Italics added.) 'The use by the Legislature in section 8 of the language 'any other provision of the criminal law' is all-encompassing, making no distinction between general or special statutes as long as the criminal activities are within the proscribed scope of such enactments.' (*People* v. *Liberto* (1969) 274 Cal.App.2d 460, 464 . . . .) Following the passage of the 1967 amendments, a series of cases held that section 484d et seq. did not bar prosecution under other statutes. (See, e.g., *People* v. *Gingles* (1973) 32 Cal.App.3d 1030, 1035-1037 . . . ; *People* v. *Liberto*, *supra*, at p. 464.)."[2]

Although the passage of this statute may have had more immediate effect on prosecutions for theft or forgery, nothing in its language limits its application to the prosecution of other violations of the Penal Code. We conclude that Penal Code section 484g does not preempt application of Penal Code section 459 to the larcenous use of a bank's automated teller machine.

 Appellant contends there was no substantial evidence supporting a finding that the two distinct acts of child endangerment charged in counts 2 and 3 were attributable to two different courses of conduct and thus, the trial court erred by failing to stay punishment for count 3 pursuant to Penal Code section 654.[3] Count 3 alleged that appellant "while having the care and custody of [Anthony], did willfully cause and permit the person and health of said child to be injured, and did willfully cause and permit said child to be placed in such situation that its person and health were endangered." Count 2 alleged the same conduct with the addition of an allegation that appellant did "inflict on [Anthony] unjustifiable physical pain and mental suffering."

The prosecutor explained the theories behind the two counts as follows: "Now, with regard to count two, that's the beating. . . . [¶] Now, count three deals with failing to render medical aid to Anthony. And we learned from the medical testimony that it was possible that Anthony could have been saved had proper steps been taken." In a note, the jury said, "It appears that the difference between count two and count three is the use of the word 'inflict' in count two and 'permits' in count three. [¶] We would appreciate

---

[2] Although not addressing the preemption issue raised here, *People* v. *Ravenscroft* (1988) 198 Cal.App.3d 639 [243 Cal.Rptr. 827], holds that the unlawful use of an ATM card constitutes an entry onto the premises of a bank within the meaning of the burglary statute.

[3] Penal Code section 654 reads in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ."

further clarification regarding the difference between counts two and three or confirmation that our interpretation is correct." The court told the jury that its interpretation was correct.

Appellant argues that there was no substantial evidence that appellant's failure to summon medical help for Anthony, represented by count 3, was a legally distinct course of conduct which can be separated from infliction of injury, count 2. ■ Multiple punishment is permissible if appellant entertained multiple criminal objectives which were independent of and not merely incidental to each other. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905].) A defendant's criminal objective is "determined from all the circumstances and is primarily a question of fact for the trial court, whose findings will be upheld on appeal if there is any substantial evidence to support it." (*People* v. *Porter* (1987) 194 Cal.App.3d 34, 38 [239 Cal.Rptr. 269].)

■ At the time of sentencing, appellant's trial attorney said, "I do think that 654 is an issue in this case with respect to count two and three. They are the same charge, . . . there is no way to deliberate between count two and three, there is no—it is not clear that she in fact inflicted the injuries and then failed to provide medical attention. In fact this is one offense, it all happened in one evening. It was not a long period of time from the time of the injuries were inflicted to the time that the paramedics were called. . . . This is a theory of the prosecution's that she can separate these things out, one is conduct and one is failure to provide medical attention, that is simply the district attorney's theory. The fact of the matter is all of this is one incident and I think those two things are 654."

The prosecutor responded, "if the court looks at the information, between count two and three the language is different. The defense has known all along that count two is the actual abuse, and count three was the failure to obtain medical aid. The court denied their 995 motion prior to trial on that issue."

Following the comments of counsel, the trial court sentenced appellant consecutively for count 3 and count 4 (the burglary) as well.[4] Appellant contends that these consecutive prison terms violated the prohibition of

---

[4]Appellant suggests that the trial court may have used appellant's overall conduct, an improper basis for imposing consecutive sentences, rather than determining whether appellant held multiple criminal objectives. The court did describe the position of trust between a mother and child and stated that that trust had been violated "in the most egregious way . . . ." In sentencing appellant for count four, however, the court makes a comment that

Penal Code section 654 against multiple punishment because her acts of abusing her child and failing to render aid constituted an indivisible transaction.

Our Supreme Court has rejected the single intent and objective analysis in the context of sex offenses committed in rapid succession. (*People* v. *Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].) This holding has been extended to nonsexual assault cases in *People* v. *Trotter* (1992) 7 Cal.App.4th 363 [8 Cal.Rptr.2d 648]. In *Trotter*, the defendant fired three shots at a pursuing officer while attempting to evade arrest. He was convicted of three counts of assault, and his consecutive sentences were upheld by the court in part because each shot posed a separate and distinct risk to the officer and nearby drivers. The defendant's conduct became more egregious with each shot. None of the assaults were incidental to or the means of accomplishing any other assault.

The evidence supports the prosecution's two separate theories of liability for appellant's two convictions for child endangerment. The trial court considered appellant an active participant in the physical abuse of Anthony. Several witnesses testified they had seen appellant strike Anthony in the past. Although she was Anthony's primary caretaker, she indicated to the police she was unaware of the extensive bruising on Anthony's body. Alone in the interrogation room with her codefendant, she said, "Because, you know why, I did it, but I guess I'm just not supposed to have him either."[5]

A separate and distinct harm to Anthony occurred when, after his injury, he was left to suffer until he lost consciousness. Expert witnesses testified that despite Anthony's serious injury, he could have been saved with prompt medical attention. Their estimates varied as to how long it would have taken Anthony to die from his internal injuries, and the court was free to accept the high end of these estimates and conclude that appellant delayed seeking help for Anthony for hours. This evidence supports the trial court's finding appellant subjected Anthony to a separate and distinct risk, perhaps to avoid detection of the earlier assault, by not obtaining medical help for his serious injuries. As appellant argues, there must be some separation between the

---

indicated the reason it sentenced appellant consecutively for count three. The court said, "[a]s to count four, the court is going to run that consecutive as well . . . [a]nd *again*, that is on the basis that they're different crimes, *different objectives* and not related to one another." (Italics added.)

[5]The "either" may be a reference to appellant's other son, also named Anthony, who, long before the second Anthony was born, was adopted by foster parents when appellant's parental rights were terminated.

infliction of injury on a child and the failure to call for medical help, or every blow would lead to a separate count for failing to come to the child's assistance. However, the failure to obtain help following an injury of this severity, inferentially to avoid detection of the initial crime, is a separate criminal objective. The court's imposition of a consecutive sentence for count three is supported by the record.

The judgment is affirmed.

Wunderlich, J., and Mihara, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 10, 1997. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.