Filed 4/28/16  White v. LinkedIn Corp. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MELINDA WHITE, | B261095 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC515787) |
| v. | |
| LINKEDIN CORP., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michelle R. Rosenblatt, Judge.  Affirmed.

JML Law, Joseph M. Lovretovich, David F. Tibor and Jennifer A. Lipski for Plaintiff and Appellant.

Curley, Hessinger & Johnsrud, Brian L. Johnsrud, Patrick M. Sherman and Christopher W. Loweth for Defendant and Respondent.

_____

Plaintiff and appellant Melinda White appeals from the trial court's grant of summary judgment for defendant and respondent LinkedIn Corp. (LinkedIn). White contends triable issues of material fact remain as to whether LinkedIn's decisions not to extend her temporary services and hire her as a full-time employee were due to her pregnancy. We disagree and affirm.

## BACKGROUND

White worked as a contractor for LinkedIn's University Recruiting Group (URG) from October 4, 2010, to July 20, 2011, recruiting summer interns, and also sometimes new college graduates. Although LinkedIn enlisted and supervised her, White was employed by Comsys, a third party service provider. Comsys and White's employment contract listed April 30, 2011, as White's anticipated termination date, which tracked the academic year and the decreased recruiting work in the spring. White was an at-will employee with no guaranteed employment.

When LinkedIn formed the URG in 2010, it consisted of just two workers, Doris Tong, the URG leader, who was also a recruiter, and Allen Hom, a contract coordinator; Joe Riley, Director of Human Resources, managed the URG until August 2010 when Brendan Browne, Director of Global Talent Acquisition, took over. To expand the URG, LinkedIn sought workers who lived in the Bay Area, near its Mountain View headquarters, because it wanted the "small though growing" group to work collaboratively, interact frequently in person, and be available to meet candidates on-site. When recruiting White, both Tong and Riley told White the job was in Mountain View and LinkedIn wanted her on-site. They also testified they told her she would be required to relocate from her residence in Long Beach to the Bay Area in order to be "converted" to a full-time position. White testified she told both Tong and Riley she was open to relocating, and when she accepted the position, White's "understanding" was that the contract job "would require [her] to be on-site in Mountain View with the intention of relocation."

2

A month before White started at LinkedIn, she e-mailed a Craigslist advertiser about a rental condo, writing, I "will be starting a new position with LinkedIn in Mountain View, which will *require* me to relocate" and I "plan to relocate mid-Oct or Nov. 1." (Italics added.) A few weeks later, however, White wrote to a colleague saying she was "[n]ot sure if I want to relocate since I really like my life in SoCal, but we'll see." When White started, LinkedIn paid for her lodging during her first month to facilitate her transition. After the first month, White paid her own travel and lodging expenses.

White became pregnant after beginning at LinkedIn and informed Tong of her pregnancy on February 9, 2011. On February 10, 2011, White told Tong she "would be inclined to relocate if [she] was converted to full-time status" but that she would not "relocate unless [she was] converted to regular employment." According to White, LinkedIn "needed to give me a reason to relocate, and that was to be full time."

A few weeks later, White provided Tong with a doctor's note stating she could travel only every other week. Tong honored this restriction. White requested no other accommodations, including time off to give birth.

By March, the URG had expanded to include Tey Scott, a rising contract recruiter, and Jill Perez, a contract coordinator. Tong, Hom, and Scott lived in the Bay Area and worked out of Mountain View. Tong permitted Perez to live in Southern California and work from home to care for her two young children because she was "simply scheduling interviews," which Scott described as a "non-candidate-facing role."

In April, as the academic year was winding down and White's contract was about to expire, White began looking for work outside of intern recruiting. On April 28, 2011, White wrote to Scott, "I sense that the internship hiring is coming to an end (at least I'm slowing down a bit)" and asked if she could assist Scott "with the NCG [new college graduate] side of things." Scott worked with Tong to provide White with some additional work. Tong also worked with others to procure work for White, which extended White's contract beyond its anticipated end date of April 30, 2011.

On May 6, 2011, White wrote to a potential recruit that LinkedIn had "no intention of converting me from contract status to FTE [full-time employee] *unless I relocate to the Bay*, so I am not sure how much longer they plan to keep me." (Italics added.) Also in May, White and Scott met to discuss how White could contribute more to LinkedIn. According to White, Scott told her LinkedIn "want[s] people in Mountain View," and "you're based in L.A. and your priorities will change." White admits she was not aware of any "FT [full-time] head count," referring to available full-time positions, at this time.[1]

On June 27, 2011, White wrote to a colleague: "One of the road blocks for [LinkedIn] in converting me to FT [full-time] status is that I haven't relocated to the Bay Area. . . . [¶] I worked remotely for Yahoo and Microsoft within the last three years, so I have my own perspective. *However, LI operates differently*, so it would be terrific to get your perspective." (Italics added.)

On June 30, 2011, LinkedIn converted Hom from a contract coordinator to a full-time recruiter. When asked in her deposition whether she thought LinkedIn had an obligation to continue her services from early July 2011 to mid to late August 2011, even if there were not enough work for her, White responded, "I think they're obligated to." She explained, "they converted Allen [Hom], so there was enough work for him. There should have been enough work for me." In addition, according to her, LinkedIn was "*anticipating* quite a bit of work as they were scaling." (Italics added.)

On July 6, 2011, Tong informed White that LinkedIn would not be converting her to a full-time employee. Tong testified at her deposition that White was not converted because White's contract had expired, work for White was dwindling, and White refused to relocate. When Tong informed White, Tong said she would not be converted because work was slowing down and there was no full-time "headcount" at the moment, but she should "check back in the fall." White testified she believed Tong was sincerely leaving the door open for her to return.

---

[1] "Headcount" is the number of employees paid through a company's payroll and does not include workers who are paid wages outside of the payroll.

On July 7, 2011, White wrote to colleagues, "There is no headcount to convert me to FT [full-time] status." White sent several other similarly worded e-mails.

On July 18, 2011, White accessed an internal database used to prepare job postings and saw an entry for a "pending" University Programs Manager position. Although White testified she understood that "pending" meant not yet approved, she e-mailed a superior requesting she be considered for the position. According to White, Tong immediately informed her the position was "not something that we're going to have open." Tong then e-mailed Scott, asking her to coordinate removing the post. Scott responded, "Done—sorry about that; I retracted it. A[w]kward, I'm sure☹." Tong and Scott stated in their declarations that the position was never approved, posted, or filled. White's last day was July 20, 2011. Shortly thereafter, Tong ended Perez's services as well.

LinkedIn promoted Scott to Manager of R&D Campus Recruiting on August 1, 2011, replacing Tong as the URG's leader; Tong became a regular recruiter and no longer made hiring decisions. Between August 1 to September 8, 2011, Scott contracted three new recruiters, who lived in the Bay Area, and contracted Perez as a coordinator again.

On August 31, 2011, White e-mailed a potential employer. She attached her resume and wrote: "It still appears as though I'm working at LinkedIn, but my contract ended in early August[2] and *they have left the door open for me to return* depending on what the circumstance are at a later time — However, as I mentioned, *they want me to relocate* at my own expense . . . ." (Italics added.)

On September 22, 2011, White e-mailed Tong about the possibility of returning to LinkedIn. Tong responded on October 19, 2011, writing that "[r]egarding the UR team, it's a full house. I know you were hoping for better news so I'm sorry." Tong also stated in her declaration that before she replied to White's e-mail, she had also explored

---

[2] White admitted her last day of work at LinkedIn was actually July 20, 2011.

5

whether LinkedIn had roles outside of the URG White could pursue, but determined there were not.

On July 20, 2012, White filed a California Fair Employment and Housing Act (Gov. Code, §§12900–12996) (FEHA) complaint with the Department of Fair Employment and Housing (DFEH) for harassment, denial of a promotion, denial of accommodation, failure to prevent discrimination or retaliation, retaliation, denial of pregnancy accommodation, and "discrimination; failure to engage in the interactive process."[3]

On July 19, 2013, White filed a complaint in the superior court for nine causes of action (1) sex discrimination; (2) disability discrimination; (3) harassment; (4) failure to prevent discrimination and harassment; (5) failure to accommodate; (6) failure to engage in the interactive process; (7) retaliation; (8) wrongful termination; and (9) wrongful termination in violation of public policy.[4] On May 28, 2014, LinkedIn moved for summary judgment, or in the alternative, summary adjudication. White opposed the motion, but the court granted it on December 18, 2014. White appealed.

## DISCUSSION

On appeal, White argues a triable issues of material fact remain as to whether LinkedIn's purported legitimate reasons for not extending her contract and not converting her were pretext for its discriminatory animus against her as a pregnant woman. We disagree.

### I.     Standard of Review

A trial court must grant summary judgment when no triable issue exists as to any material fact, entitling the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) To defeat summary judgment, the plaintiff must " 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action

---

[3] Although neither party indicated if, or where, White's right to sue letter is contained in the record, LinkedIn does not dispute that White had the right to sue.

[4] On appeal, White abandoned her third (harassment), fifth (failure to accommodate), and sixth (failure to engage in the interactive process) causes of action.

. . . .' " (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477.) We review the trial court's grant de novo. (*Id.* at p. 476; *Romero v. American President Lines, Ltd.* (1995) 38 Cal.App.4th 1199, 1203 ["in a discrimination case . . . we must review the matter de novo, granting no particular deference to the trial court ruling"].) That is, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill*, at p. 476.) When considering all the evidence, however, we " 'view the evidence in the light most favorable to plaintiff[] . . .' and 'liberally construe plaintiff['s] evidentiary submissions and strictly scrutinize defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff['s] favor.' " (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97.)

A three-part burden-shifting analysis applies in discrimination actions if no direct evidence of discrimination is offered. (*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–804 [93 S.Ct. 1817]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) White presented no direct evidence of discrimination; therefore, the burden-shifting test applies. First, the plaintiff has the burden to establish a prima facie case of discrimination. (*Guz*, at pp. 354–355.) "If . . . the plaintiff establishes a prima facie case, a presumption of discrimination arises." (*Id.* at p. 355.) LinkedIn concedes, for the purposes of this appeal, that White established a prima facie case. Second, the burden shifts to the defendant to rebut this presumption by demonstrating a legitimate reason for the adverse action. (*Id.* at pp. 355–356.) If the defendant establishes a legitimate reason for the adverse action, the discrimination presumption "disappears." (*Id.* at p. 356.) Third, the burden shifts again to the plaintiff to demonstrate the allegedly legitimate reason was actually pretext. (*Ibid.*) These inquiries "are questions of law for the trial court, not questions of fact for the jury." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201.)

Our appellate courts have disagreed somewhat about the application of this analysis. In particular, courts have disagreed about the degree to which a plaintiff must demonstrate pretext. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th

7

997, 1004 (*Hersant*).) The majority of courts, however, require "the employee [to] rebut the employer's stated nondiscriminatory reason with substantial evidence of its falsity or present other evidence suggesting a discriminatory basis, or some combination of the two such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Ibid.*; see also *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 (*Martin*).) "[T]he great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence *as a whole* is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361, italics added.) That is, " '[t]he [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." ' " (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005.)

We agree that requiring the plaintiff to demonstrate pretext by substantial evidence is the proper standard because a mere scintilla of evidence alone cannot be enough to defeat summary judgment. (*Martin*, *supra*, 29 Cal.App.4th at p. 1735 ["The purpose of the summary judgment procedure . . . is to identify those cases in which there is no factual issue which *warrants the time and cost of factfinding* by trial," italics added].)

**II. Summary judgment was proper**

**A. White failed to demonstrate sex or disability discrimination**

**1. LinkedIn rebutted the discrimination presumption**

LinkedIn met its burden to demonstrate it discontinued White's services and did not convert her for legitimate business reasons. (*Guz*, *supra*, 24 Cal.4th at pp. 355–356.)

First, LinkedIn argues White refused to relocate although it *required* Bay Area residency for full-time recruiters to enable collaborative work, frequent interaction, and in-person meetings with candidates on site. It offered testimony from Tong supporting that it made this relocation requirement known to White, both while she was interviewing and during the time she provided her services. LinkedIn paid White's lodging expenses for the first month to facilitate the required relocation.

Second, LinkedIn argued the seasonal slowdown left too little recruiting work to justify White's continued employment. LinkedIn offered White's October–April contract as evidence White's work was expected to last only until the spring. LinkedIn presented e-mails from White and Tong referencing this slowdown as well as e-mails showing Tong and Scott had subsequently looked for work outside White's normal duties to keep her occupied after the slowdown began. White does not deny Scott and Tong procured her additional work after her contract ended. Although White denied the seasonal slowdown, she responded, "yes," when asked if "as the intern recruiting and new college graduate recruiting work was starting to slow down . . . [she] look[ed] for other things to do at LinkedIn."

LinkedIn's reasons were legitimate, nondiscriminatory, and supported by sufficient evidence. LinkedIn need not have additionally proved the reasons were prudent or competent. (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1149; *Hersant*, *supra*, 57 Cal.App.4th at p. 1005.)

### 2. White failed to demonstrate pretext through substantial evidence

#### a. White knew LinkedIn required relocation for conversion

Once LinkedIn rebutted the discrimination presumption, it "disappear[ed]" and the burden shifted back to White to demonstrate pretext. (*Guz*, *supra*, 24 Cal.4th at p. 356.) White did not meet this burden.

First, White claims LinkedIn failed to produce any evidence proving it had a relocation requirement before she announced her pregnancy, or that, even if it did, it informed her about the requirement before her announcement. LinkedIn *did* present evidence, however, defeating both of White's contentions: White's own e-mail sent *prior* to starting stating her new position would "*require*" her to relocate and that she planned to relocate. (Italics added.) LinkedIn also presented supporting testimonial evidence. For example, White testified that when she accepted the job she understood it was "on-site in Mountain View with the intention of relocation" and that LinkedIn offered to pay for her first month's lodging because LinkedIn's "intention was to convert [her] to fulltime" in Mountain View. Although White attempted to present counter evidence, she failed. To start, she cited to her objections below to LinkedIn's statement of facts, but here those objections are immaterial. She also offered her later deposition testimony, where she denied knowing of the relocation requirement before beginning at LinkedIn, but it was directly contradicted by her own e-mail sent prior to her first day. Finally, she failed to support some of her arguments with record citations (and we therefore disregard those arguments (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745)).

Evidence in the record suggests it was White's reluctance to move[5] that impeded her relocation, not LinkedIn's communication of its relocation requirement. For example, before White even started at LinkedIn, she wrote to a friend her position was

---

[5] The record suggests White was hesitant to relocate because (1) her contract position was not guaranteed to produce full-time employment, (2) relocating would be difficult to do while pregnant, (3) she thought she might be selling her house in Long Beach at a loss and (4) housing prices in the Bay Area were too high, and (5) her significant other's elderly parents, who lived in the Los Angeles area, had failing health.

"contract-to-hire and that's fine by me. *I want to try them out too*. They are putting me up in corporate housing for a month, then I go back and forth from SoCal to the Bay. *Not sure if I'll relocate* since I really like my life in SoCal, but we'll see." (Italics added.) Likewise, after White announced her pregnancy, she told Tong she "would be inclined to relocate if [she] was converted to full-time status," but that she would not " 'relocate *unless* [she was] converted to regular employment.' " (Italics added.) According to White, LinkedIn "needed to give me a reason to relocate, and that was to be full time." None of this suggests White was unaware of the relocation requirement, but, to the contrary, that she was keenly aware of it but did not like the requirement and did not want to conform to it.

The URG's hiring practices also substantiate the relocation requirement. White presented no evidence refuting that all the other full-time and contract recruiters brought on between fall 2010 and fall 2011 lived in the Bay Area.

Finally, White argues her contract did not require relocation. White's contract with Comsys for temporary services to LinkedIn, however, is not binding on LinkedIn's hiring requirement for full-time employees. Moreover, White admits that her Comsys contract did not entitle her to full-time employment.

     **b. White's work decreased, as expected, and there was no available full-time work for her either in spring or fall 2011**

Second, White argues there was no overall seasonal slowdown and LinkedIn used this as an excuse to keep work away from her. LinkedIn's evidence refutes White's contention. White's contract was from October 4, 2010, to April 30, 2011, tracking the academic year. She admitted in her deposition that the "date range corresponds fairly closely with the intern recruiting cycle." White does not dispute that she sent an e-mail to Scott on April 28, 2011, just two days before her contract was to end, stating, "I sense that the internship hiring is coming to an end (at least I'm slowing down a bit)." Nor does White dispute that Tong and Scott had to actively help her procure additional work beyond April 30, 2011, to keep her busy. Tong testified that by at least June 2011, there

11

was not enough work to occupy White full time, and the work White was doing was not related to hiring interns, which had been White's focus.

White herself also testified that "the work was lessening" in recruiting at the end of spring 2011, although she attributed it to being excluded from meetings. White, however, does not argue that her contract was for anything more than nonmanagement recruiting or that she was entitled to attend management meetings. She also fails to acknowledge that Hom and Perez, nonpregnant contractors, were also excluded from the meetings or that the only contractor invited to attend was Scott, who was under consideration for management. White also admitted in her deposition that she was only inferring that Browne wanted to exclude her from management meetings "[b]ecause he knew that there would be a time when I would have to leave because of having my baby, so I was probably pretty useless at that point."

Also supporting the existence of a slowdown, Tong discontinued Perez's services after White's last day because Perez was working only 5 to 10 hours per week in April, which Tong stated in her declaration was due to the slowdown. White claims LinkedIn contracted Perez as a remote recruiter in August 2011; White, however failed to present any evidence supporting this claim, and the record substantiates that Perez was contracted as a coordinator, not a recruiter. Although Scott testified that LinkedIn later hired Perez as a full-time remote recruiter, Perez was not a full-time remote recruiter between spring and fall 2011, when White was seeking to continue working for LinkedIn. This evidence, collectively, is indicative that seasonal slowdown was not only an anticipated phenomenon, but one that actually occurred.

Third, White argues LinkedIn had available recruiting work. For example, White offered an internal e-mail sent in April announcing hoped-for global recruiting growth as evidence of available recruiting work and testified she knew the URG "anticipated" more work. Even if this anticipated growth materialized at some point, it does not speak to whether LinkedIn had work for full-time remote recruiters in California *at the time* White was seeking work.

12

White argues that Hom's conversion in late June confirms LinkedIn had available work during her services, but chose to give it to a man instead of White, who was pregnant. Hom, however, had been part of the URG longer than White and *lived in the Bay Area*. White also acknowledged in an e-mail, sent after her temporary services had been terminated, that LinkedIn "left the door open for me to return" but expressed hesitation to do so because LinkedIn wanted her to relocate at her own expense. This suggests that LinkedIn's conversion of Hom, and not White, was motivated by Hom's Bay Area residency and White's reluctance to relocate. White also complains that work and opportunities were directed to Hom, instead of her. LinkedIn, however, had a legitimate reason to occupy Hom, its full-time employee, over that of a contractor whose anticipated termination had already passed.

White further argues that LinkedIn interviewed candidates for "her position" in July, evidencing it was "gearing up to get rid of" her, despite available work. To start, White had no entitlement to "her" position. She testified she understood her anticipated end date was in April 2011 and knew her at-will position was not a guarantee of employment. In addition, LinkedIn was allowed to interview URG candidates in a competitive selection process, and White has no proof that the candidates were being interviewed specifically to replace her or when they would begin. Finally, LinkedIn had legitimate reasons to look to other candidates in creating the fall 2011 team: White told LinkedIn she did not intend to relocate as required unless LinkedIn met her condition of offering full-time employment and Tong testified that the rest of the URG was burdened by this decision because the team had to greet White's candidates in person when they visited Mountain View.

White argues LinkedIn also immediately removed a URG job posting after she inquired about it, just days prior to her leaving, presumably indicating LinkedIn's intent to preclude her from working at LinkedIn, despite available work. White contends that Tong's and Scott's allegedly inconsistent explanations about the posting's removal and Scott's comment to Tong that the situation was "[aw]kward, I'm sure☹" support her contention. The position, however, was never approved, never offered to the public, and

13

never filled, and Tong told White the position was not available. White cannot argue she was deprived of an employment "opportunity" when the position was not, and never did become, a reality. Scott also explained that she characterized the situation as awkward because Tong was in the uncomfortable position of explaining to White that (1) even though White wanted to continue working at LinkedIn, (2) had been let go, and (3) it appeared there was an available attractive employment opportunity, (4) there was in fact no such opportunity. White's argument is also rebutted because White admits both Tong and Scott worked to find White additional assignments after the anticipated end date of her contract and *after* they knew she was pregnant. Nothing in the record suggests this additional work indicated a full-time position was available in the URG and Tong's and Scott's actions, if anything, suggest LinkedIn was not biased against pregnant women.

Finally, White argues LinkedIn bringing on other recruiters within a few weeks of her last day proves there was available recruiting work. All the new workers, however, were contractors, all were contracted at the start of the academic season, and all lived in the Bay Area and worked out of Mountain View. Tong also testified she "wouldn't say there was work" at this time; instead, "[w]e were gearing up for it. We were in [the] planning stage. We were ramping them up, getting them trained." White also e-mailed Tong about open positions in late September 2011 *after* LinkedIn contracted these recruiters. She offered no evidence the URG had available work for her after bringing on the three new contractors. In fact, when White e-mailed Tong, she acknowledged the URG might not have available work, writing, "If there isn't a place for me on the UR team, I'm wondering if this higher education evangelist team would be a possibility?"

### c. The URG hiring team was not biased

Fourth, White argues that the URG hiring team knew White was pregnant, knew she wanted to keep working at LinkedIn, and "must have known" about upcoming positions, suggesting that because White was pregnant they chose to exclude her from potential positions. For example, White accused Scott of once telling White that her "priorities would change." Scott stated in her declaration, however, that she did not recall making the statement and it did "not sound like something I would say to any

14

colleague." Even if Scott did make this comment, it was not while Scott was in a hiring position. Tong ended White's services in spring 2011, and by the time Scott was making hiring decisions in fall 2011, Tong reported to White there was no available work; White does not argue there was.

White also points to an e-mail where Tong mentioned White's impending due date when informing White she wanted to talk. She cites *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088 for the proposition that Tong's comment "taken in context with the concurrent news that she was being terminated" could lead a reasonable factfinder to "infer that LinkedIn had decided to end Ms. White's employment because they did not think she would be a valuable contribution with her due date looming." When considered in context with Tong's other e-mails, however, Tong's opening line of, "Hope you're feeling well, your due date is coming soon," suggests she was merely engaging in friendly chatter. If anything, it speaks to the *timing* of the end of White's services, not the *rationale* for it. (See *Fu v. Walker Parking Consultants* (2011) 796 F.Supp.2d 1148, 1154, 1157 [discussion of *timing* of plaintiff's layoff in relation to her maternity leave was not evidence of discrimination under California law where it did not appear to be the *rationale* for it].) In light of the weight of the countervailing evidence, this comment, at best, creates " 'only a weak issue of fact' " as to whether LinkedIn's reasons were untrue (*Guz*, *supra*, 24 Cal.4th at p. 362, quoting *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 148 [120 S.Ct. 2097, 2109]) and does not "warrant[] the time and cost of factfinding by trial." (*Martin*, *supra*, 29 Cal.App.4th at p. 1735.)

### d. White's work ethic, performance, and desire to stay at LinkedIn are not determinative

Fifth, White argues that she wanted to work at LinkedIn, was interested in contributing, met her recruiting targets, and was "happy" to take on extra work; despite this, she argues she was excluded from management meetings, had responsibilities taken away, and was not given opportunities which would enhance her career. Although this might be evidence that White was an ambitious employee and one worthy of consideration for full-time employment, it does not speak to the essential issue: Whether

15

LinkedIn impermissibly discontinued White's at-will and limited services and chose not to convert her *because* she was pregnant and would soon be a new mom. For the reasons discussed above, White failed to present evidence of pretext and her desire to remain at LinkedIn, and evidence she believes proves she was qualified to stay, is therefore irrelevant.

**B. White failed to demonstrate a failure to prevent discrimination**

Because White's discrimination cause of action fails, so does her derivative failure to prevent discrimination claim. (*Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1317–1318.)

**C. White failed to demonstrate retaliation**

The analysis for retaliation is the same as discrimination, and, if the final stage is reached, requires a plaintiff to prove pretext. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 815.) Although White and LinkedIn agree on the analysis, they disagree whether White engaged in protected activity, whether Assembly Bill No. 987 (2015–2016 Reg. Sess.) (redefining protected activity) retroactively applies, or whether White exhausted her administrative remedies. Even resolving the disagreements in White's favor, her retaliation claim fails because she cannot prove pretext.

**D. White failed to demonstrate wrongful termination in violation of either FEHA or public policy**

White, again, predicated her FEHA and public policy arguments on her failing pretext analysis. Because she cannot establish pretext, her FEHA and public policy arguments fail.

16

## DISPOSITION

The judgment is affirmed.  LinkedIn Corp. is awarded its costs on appeal under California Rules of Court, rule 8.278.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.